[No. 26757. Department One. November 30, 1937.]

E. SCHOENWALD *et al., Appellants,* v. DIAMOND K PACKING COMPANY, *Respondent.*[1]

[1]Reported in 73 P. (2d) 748.

410

*John J. Kennett, Revelle, Revelle & Kells,* and *Edward M. Hay,* for appellants.

*Allen, Froude & Hilen,* for respondent.

BLAKE, J.—The plaintiff E. Schoenwald and defendant entered into the following contract:

"THIS AGREEMENT made this 28th day of February, 1934, between the DIAMOND K PACKING COMPANY, a corporation, first party, and E. SCHOENWALD, second party,

"WITNESSETH:

"THAT, WHEREAS the second party has rendered valuable services to the first party and has been instrumental in securing for first party a certain fish-trap location near Snow Pass, located about 1¼ miles westerly from Point Nesbit, on Zarembo Island, in the Territory of Alaska; and

"WHEREAS said services were rendered by second party under a definite understanding as to compensation therefor, and it now being desirable to reduce the agreement in respect thereto to writing; now, therefore,

"IN CONSIDERATION of the services rendered by second party for first party in obtaining said fish-trap location,

"IT IS AGREED between the parties hereto as follows:

"First party shall install a fish-trap at the site of said location, after having obtained the necessary permits therefor, and said first party shall cause the erection and installation of said trap, the same to be completed in sufficient time to take care of the 1934 fish run, and said first party shall maintain said trap as long as the same location shall be open to it, *unless said first party shall notify second party on or before December 20th that it will not construct or operate said trap the following year, and second party shall have then the right to make arrangements for the construction and maintenance of this trap for the benefit of both parties under this agreement.*

"If said location should be closed and later restored to it, first party shall make any necessary repairs to the trap, and maintain it, the same as though it had never been closed.

"First party agrees to advance the funds required for the construction, maintenance, operation and repair of said trap, one-half of said expense to be refunded to said first party as hereinafter provided.

"The account for this trap shall be charged with the direct expense of constructing, maintaining, operating and repairing the same, including licenses, permits and taxes, etc., except that no charge shall be made for the use of the pile-driver or other floating equipment.

"It is understood and agreed that the second party shall have a one-half ($\frac{1}{2}$) interest in said fish-trap and in all of the fish caught therein, and that the fish taken from said trap shall be counted separately, at the elevator of the cannery, by the first party, and a true and accurate record kept of each delivery of fish to said cannery. The first party (being the owner of a fish cannery) agrees to buy from the second party, and the second party agrees to sell to the first party, all of his share of the fish caught in said trap, to-wit: one-half ($\frac{1}{2}$) of the total catch of said trap, and first party agrees to pay to the second party the following prices for said fish: For red salmon first party agrees to pay a price which shall be five cents (5c) per fish less than the average price paid by the industry in that locality to gillnet fishermen for Stikine red salmon.

412

The price for pink salmon, dog salmon and cohoes shall be the price generally paid in the Clarence Straits district by representatives of responsible canneries for trap fish of said varieties during the season in which they are caught. First party further agrees that it will endeavor to sell any king salmon which may be caught in the trap, to buyers of fresh fish, at the prevailing market price.

"First party agrees that on or before October 10th, 1934, and the 10th of October of each and every year thereafter, it will render to second party a complete detailed statement of the operations of said fish-trap, which statement shall show the catch of said trap and the cost, in detail, of the construction, maintenance, operation and repair of said trap for said year.

"One-half ($\frac{1}{2}$) of the cost of the licenses, permits, materials, taxes and/or construction of said trap, and of the maintenance, operation and repairs of said trap, for the current year, and for each succeeding year said trap is constructed or repaired, maintained or operated, shall be deducted from the amount due the second party for his half of the fish, as determined on the scale of prices above mentioned, and the first party agrees to pay to the second party the amount due him, after such deductions, as provided in this contract, on or before the 15th day of October of each and every year.

"The first party further agrees that it will tend the fish-trap herein mentioned, during the fishing season, in such a manner that its fishing efficiency will not be impaired at any time, and to this end agrees that said trap shall have a preference, in being tended, over all other traps operated by first party, weather permitting.

"Should the cost of construction, maintenance, repair and operation of said trap in any year exceed the value of fish caught in said trap for that year, first party shall be reimbursed by second party for one-half ($\frac{1}{2}$) of said deficit out of the second party's share of the catch of fish of subsequent years.

"It is further agreed that if the first party should at any time be deprived of the use of this trap-site and the same shall be thereafter restored to it, such restoration shall *ipso facto* restore second party's half interest in said trap, and after any such restoration second

party's rights shall be governed and determined by this agreement the same as though first party had never been deprived of the use of said trap.

"First party further agrees to insure all employees on said trap and on any equipment used in and for the construction, maintenance, repair and operation of said trap on the fullest liability coverage obtainable, and in any event to the extent of the Alaska Workmen's Compensation act insofar as said insurance is procurable, and to make any payments required to the Territory of Alaska, or any political subdivision thereof, on account of the operation of said trap, and any payments so made and the cost of insurance, above referred to, shall be included in and considered a part of the maintenance cost of said trap and so charged in maintenance cost.

"The first party agrees to construct and to at all times maintain said trap in a careful and prudent manner, and to exercise due care for the safety of all employees used in the operation of said trap, and any liability or claim for damages which could not be covered by the insurance herein provided for shall be the equal liability of the first and second parties.

"Should the first party fail or neglect to insure all employees as mentioned above on said trap or on any equipment used in and for the construction, maintenance, repair and operation of said trap, any suits that may be brought for damages which could have been covered by insurance arising or claimed to have arisen out of the construction, maintenance or operation of said trap, shall be defended by first party, at its own cost.

"EXECUTED in triplicate at Seattle, Washington, this 28th day of February, 1934.

"DIAMOND K PACKING COMPANY,
First Party,
"By KARL THEILE, (SEAL)
President,
"ATTEST: CELIA McL. THEILE,
Secretary.
"E. SCHOENWALD,
Second Party."

Pursuant to the contract, the defendant operated the fish-trap during the seasons of 1934, 1935, and 1936. Plaintiff, being dissatisfied with the accounting made by defendant, commenced this action in the spring of 1936 for an accounting of the catch for the years 1934 and 1935. By supplemental complaint, he called for an accounting of the catch in 1936. December 19, 1936, while the action was pending, defendant notified plaintiff that it would not operate the trap during the season of 1937, and demanded that plaintiff, pursuant to the terms of the contract, make arrangements for the construction and maintenance of the trap during the season of 1937, "for the benefit of both parties to said agreement as in said agreement provided."

Thereupon, plaintiff filed a supplement to his complaint, pointing out that the contract contains no provision relating to his operations upon his availing himself of the right to construct and maintain the trap, other than that he shall act "for the benefit of both parties under this agreement." He alleged that the defendant asserted, among other things, that, although it would not operate the trap during the season of 1937, nevertheless plaintiff was bound, in case he operated, to sell to the defendant all the fish taken, at the prices set out in the agreement. Plaintiff asked that the court construe the contract and "decree the respective rights and duties of the parties" in the contingency of his operating the trap.

The case was tried on the issues presented by the complaint as supplemented. (John J. Kennett, having acquired one-half of plaintiff's interest under the contract, was made a party plaintiff.) On the accounting feature of the case, the court entered judgment for plaintiff. From this part of the judgment, no appeal is taken, except as to the matter of allowance of costs, which later will be noticed more particularly.

With respect to the rights and obligations of the parties in the contingency of operation of the trap by plaintiff, the court entered a decree providing, among other things, the following:

"(18) That said contract provided,

" '. . . said first party shall maintain said trap so long as the same location shall be open to it, unless said first party shall notify second party on or before December 20th that it will not construct or operate said trap the following year, and second party shall have then the right to make arrangements for the construction and maintenance of this trap for the benefit of both parties under this agreement.'

"That on December 19, 1936, the defendant, pursuant to the above quoted provision of the contract, notified the plaintiff that it would not construct, maintain or operate said fish trap for the season of 1937, and demanded that plaintiff make arrangements for the construction, maintenance and operation of said trap for said season.

"That the plaintiff, under said contract provision and notice given pursuant thereto, is not obligated to construct, maintain and operate said trap for said season, but that in the event plaintiff elects to and does construct, repair, maintain and operate said trap for the 1937 season, the rights and obligations of the parties in respect thereto and the fish caught therein shall be as follows:

"(a) Plaintiff must sell to defendant and defendant must buy from plaintiff, at the prices provided in said contract, all of the fish caught in said trap.

"(b) The plaintiff and John J. Kennett, either personally or through their servants, shall be in sole control of the operation of said trap, and they or their said servants shall have the absolute right to determine when the fish shall be brailed therefrom, and if in their opinion, at any time, it is necessary to brail the fish from said trap so as to permit it to be fished at its maximum efficiency, they or their servants shall have the right to have the fish brailed and transported to defendant's cannery by any tender they or their servants may select, and the expense thereof, in such

circumstances, shall be charged as hereinafter provided.

"(c) The fish, when brailed from said trap, must be kept separate from all other fish until after they have been counted separately, by varieties, at the elevator of defendant's cannery. The fish counter, or tallyman, shall immediately after completing the count, or tally, of each delivery of fish from said Snow Pass trap, enter in writing upon a proper form, from the counting machines, the exact number of each variety of salmon so delivered, which writings shall be known as 'fish tickets'; and said fish tickets shall be signed by the fish counter, or tallyman, and a sufficient number of carbon copies thereof shall be made by him to enable defendant to send one copy to plaintiff and one copy to John J. Kennett.

"(d) The defendant must and shall, on Monday of every week during the fishing season, mail to the plaintiff and to John J. Kennett, each, at the Smith Tower, Seattle, Washington, a statement showing the exact number of each variety of salmon taken daily from said trap and received at defendant's cannery up until midnight Friday of the preceding week; and there must be attached to each of the said statements carbon copies of the fish counter's fish tickets for each delivery of fish from said trap to defendant's cannery during the preceding week. Said statement also shall show the price per fish the defendant claims is due under the contract, for each variety of salmon received during the preceding week.

"(e) The defendant must and shall on Monday of each week during the fishing season, pay for all of the fish taken from said trap and received by it at its cannery on or before midnight of Friday of the preceding week, at the prices fixed in the contract, which payment shall be made by the defendant depositing the full amount owing for all of said fish in THE NATIONAL BANK OF COMMERCE, or its successors or assigns, at Seattle, Washington. If the funds so deposited are transmitted from Alaska by cable, the cost of so transmitting said funds shall be charged to the trap account.

"(f) The funds thus deposited with the bank shall

be held by the bank as a depositary or escrow agent, until the final accounting for the season between the plaintiff and the defendant as hereinafter provided, except that withdrawals may be made therefrom at any time, for the purpose of paying the expenses of construction, maintenance and operation of said fish trap, upon the joint signatures of E. Schoenwald, John J. Kennett and Diamond K Packing Company, or the successors or assigns of any of them; all of such disbursements to be made directly to the person, company or corporation entitled thereto.

"(g) That on or before October 10, 1937, the plaintiff and John J. Kennett shall file with the bank and deliver to the defendant a complete itemized and detailed statement of account showing all indebtedness incurred and expenditures made in the construction and maintenance of said fish trap for said season, and the defendant shall likewise deliver to said plaintiffs and file with the bank a complete itemized and detailed statement of account showing all indebtedness incurred by it and expenditures made by it which are properly chargeable to the trap account under the contract as construed and defined by this decree; and on or before October 15, 1937, said plaintiffs and defendant shall meet and agree upon the items set forth in their respective accounts so filed with the bank. All items in said accounts which are agreed upon between said parties shall be promptly paid from the funds on deposit in said bank; and if said parties all agree as to all items of their respective accounts, and cause payment of the same to be made, the balance of any funds then remaining in said bank shall be divided as follows: one-quarter ($\frac{1}{4}$) thereof to E. Schoenwald or his successors or assigns; one-quarter ($\frac{1}{4}$) thereof to John J. Kennett or his successors or assigns; one-half ($\frac{1}{2}$) thereof to the Diamond K Packing Company, a corporation, or its successors or assigns. In the event said parties are unable to agree as to the items of their respective accounts, or any other matter pertaining to such accounting, sufficient funds shall be left in said account in said bank to cover all disputed items, and said funds shall so remain in said bank until the dis-

puted items shall have been settled by arbitration or court action; provided, however, that any funds in excess of those needed to pay such disputed items shall be paid over to said Schoenwald, Kennett and Diamond K Packing Company in the proportions above set forth.

"(h) Plaintiffs shall be entitled to charge to the trap account the actual rental cost of all 'floating equipment' as hereinbefore defined, and all direct expense of operating the same in connection with the construction, repair, maintenance and operation of said fish trap.

"(i) That the cost of brailing and of transporting the fish from the Snow Pass trap to the defendant's cannery shall be charged against the trap account.

. . . .

"(22) That if for any reason the defendant in any year in which the said plaintiffs, their successors or assigns, pursuant to notice, have constructed, repaired, maintained and operated said trap, fails to operate its cannery, said plaintiffs then shall have the absolute right to sell and dispose of the fish caught in said trap, at the best prices obtainable, and to whomsoever they see fit; and in such circumstances they shall, on or before the 10th day of October of any such year, render to the defendant a full, true, complete and accurate statement of the costs of the construction, repair, maintenance and operation of said trap, and said statement shall also show the total number of fish caught in said trap in said season, by varieties; the persons to whom said fish were sold; and the prices received therefor—and on or before October 15th of any such year the said plaintiffs, their successors or assigns, shall pay over to the defendant one-half ($\frac{1}{2}$) of the net profits resulting from said season's operations.

"(23) If the defendant fails on any Monday to account and pay for the fish caught the preceding week, as required by subdivisions (c), (d) and (e) of paragraph (18) hereof, the said plaintiffs, their successors or assigns, shall thereafter have the same right to sell and dispose of the fish as provided in paragraph (22) of this decree, and shall have the same obligations as set forth in said paragraph; provided, further, that in the event said plaintiffs, their successors or assigns,

sell said fish at prices less than those provided in the contract, one-half (½) of the difference between the sale price of said fish and the contract price of said fish shall be deducted from the net proceeds due the defendant at the time settlement is made between the parties.

"In the event of interruption of communication between Alaska and Seattle, making it impossible for the defendant to account and pay for the fish as hereinabove provided, or in the event the defendant is unable to pay for said fish because of the failure of the bank with which it does business, the provisions of this paragraph shall not apply."

Paragraphs 19, 20, 21 and 24 of the decree define further rights and duties of the parties under situations that might arise under plaintiff's operation of the trap. We have quoted the decree to an extent, however, that shows quite clearly that the court, in interpreting the contract, has imposed obligations and conferred rights on the respective parties that cannot be found within the four corners of their agreement. Indeed, taking the instrument by its four corners, it is quite clear that the contract was drawn solely in contemplation of the operation of the trap by the defendant. It is apparent that the possibility of operation by plaintiff was so remote in the minds of the parties that it was not thought necessary to provide specifications for his operations. The parties themselves were content to provide merely that, in that contingency, he

". . . *shall have then the right to make arrangements for the construction and maintenance of this trap for the benefit of both parties under this agreement.*"

The stipulation is most general in its terms, and, as we see it, imposes upon plaintiff, in the event he elects to operate, the obligation only to account for the net proceeds of the venture. True, the contract contemplates a joint adventure, but it delegates control of

the undertaking to one or the other of the parties to the contract. If defendant operates, he is bound by specific conditions and stipulations to which he agreed. If plaintiff operates, he is bound only by the general condition to which defendant also agreed. In case of plaintiff's operation, there is no more reason for holding him to the agreement to sell his half of the fish to defendant than there is for holding defendant to his obligations to "advance the funds required for the construction, maintenance, operation and repair of said trap," and to provide, without charge, "the use of the pile-driver or other floating equipment," necessary to the construction and maintenance of the trap.

It is our view that, under the contract as made by the parties, the plaintiff, in the contingency of his operation of the trap, is bound only to account to the defendant for one-half of the net proceeds of the venture. Any other construction of the contract must inevitably lead to the result reached by the trial court: the writing of a new contract. However broadly we may construe and apply the declaratory judgment act, this the court is not permitted to do. In proper cases, the court has always had the power to reform contracts, but never the power to make them. In this respect, at least, the declaratory judgment act has not broadened the powers of the court. Under it, the court may construe but not supplement contracts.

It has been suggested that the clause giving plaintiff "the right to make arrangements for the construction and maintenance of this trap for the benefit of both parties under this agreement" does not give him the right to "operate." We think the right to operate is necessarily implied. Otherwise the mere "construction and maintenance" of the trap would not be of benefit to either party.

It is also suggested by defendant that, since

plaintiff invoked the power of the court to enter a declaratory judgment, he is in no position to complain of the judgment entered. The suggestion is without merit. To sustain it would, in effect, deny the plaintiff in all such cases the right of appeal.

 After perfecting his appeal, plaintiff filed in this court an original petition praying further relief under the declaratory judgment act in the event we hold the decree of the lower court erroneous. There are several reasons for denying this petition, one of which is that it calls for the adjudication of questions not raised by the appeal and which are beyond the original jurisdiction of this court.

Furthermore, in view of the construction we have put upon the contract, plaintiff would not be entitled to the relief he seeks. As we have already said, in the contingency of operation of the trap by plaintiff, he is bound only by the general provision requiring him to operate *"this trap for the benefit of both parties to this agreement."* That obligation calls for only an accounting by him of the net proceeds of the operation. In other words, *none* of the subsequent provisions of the contract has any application to the rights and obligations of the parties in the years plaintiff operates the trap.

 In connection with the accounting phase of the case, plaintiff asked the court to make substantial allowances as attorney's fees and for the services of accountants. This the court declined to do, and plaintiff assigns error. We have repeatedly held that the court has no power in an adversary proceeding to assess attorney's fees in the absence of statute or contract. The rule has been applied in equitable as well as law actions. *Legg v. Legg,* 34 Wash. 132, 75 Pac. 130; *In re Williamson,* 75 Wash. 353, 134 Pac. 1066. In the latter case, the court said:

"It is further contended by counsel for appellant that the trial court erred in awarding judgment for $150 attorney's fee against Mrs. Hazzard and in favor of Miss Williamson. As between those two, the settlement of this account by the court was clearly an adversary proceeding. Hence the court, in effect, awarded an attorney's fee beyond the statutory fees allowed in that behalf in favor of the successful litigant. Our repeated decisions are to the effect that this cannot be done. There are no attorney's fees as between litigants, under our law, other than those specifically prescribed by statute. This is true whether the controversy involved be such as might have been heretofore denominated legal or equitable. Our decisions have been the same in both classes of cases."

, Obviously, the rule applies with as much, or greater, force to charges of accountants. On this phase of the appeal, the judgment is affirmed. With respect to the declaratory judgment, the cause is remanded, with directions to modify the decree by striking therefrom those portions brought before this court by the notice of appeal, to-wit: all that portion of paragraph 18, including and following the fourth line from the bottom of page 13 of the decree; the whole of paragraphs 19, 20, 22, 23 and 24 of the decree.

STEINERT, C. J., MAIN, and SIMPSON, JJ., concur.

HOLCOMB, J. (dissenting)—The prevailing opinion is too narrow, and it is not in accord with the letter and spirit of the declaratory judgment act, Rem. Rev. Stat. (Sup.), § 784-1 [P. C. § 8108-21] *et seq.*, Laws of 1935, chapter 113, p. 305, as amended by Laws of 1937, chapter 14, p. 39.

That act, among other things, provides:

§ 784-1. "Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed. . . . The declaration may

be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

§ 784-2. "A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

§ 784-3. "A contract may be construed either before or after there has been a breach thereof."

§ 784-6. "The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."

§ 784-8. "Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. . . ."

§ 784-12. "This act is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered."

The petition for a declaratory judgment was made by appellants. Their petition specifically stated and recognized

". . . that the said contract makes no other provisions with respect to the second part of its construction, maintenance, and operation of said fish trap,"

and then requested the court to define the rights and duties of the parties in the event that the second parties operate the trap. This is precisely what the court did, and appellants are now in no position to complain of the action of the trial court which only complied with their request.

The declaratory judgment acts are identical in all respects so far as they have been examined. They should be construed in the same way by all courts. All of them provide that they are remedial and shall be liberally construed.

Under the Federal declaratory judgment act, in *Hann v. Venetian Blind Corp.*, 15 Fed. Supp. 372, the district court stated that its purpose was to allow courts to take jurisdiction of actual controversy in order to grant declaratory relief either before or after the stage of relief by coercion had been reached. Among other things, the district judge there said:

"As somebody once put it, through declaratory judgment the law is turned from a repair shop into a service station."

In *RKO Distributing Corp. v. Film Center Realty Co.*, 53 Ohio App. 438, 5 N. E. (2d) 927, a case involving an invalid lease, that court held that, although the lease was invalid, the parties had rights arising thereunder which constituted evidence of a contract between the parties and created rights in favor of the lessor for damages for breach of the contract or specific performance. It held that, under the Ohio statute, which, like ours, provides for liberality in construction, it was a proper matter for relief under the declaratory judgment act; and that equity would reform the lease to make it conform to the intention of the parties, and the parties thereto would be entitled to specific performance in accord with their actual intent as shown by the agreement.

There was palpably much more of the making of a new contract for the parties there than is the case here. See *Hess v. Country Club Park*, 213 Cal. 613, 2 P. (2d) 782; *Tolle v. Struve*, 124 Cal. App. 263, 12 P. (2d) 61.

In the first California case above cited, the supreme court said:

"The pleadings in this case present a practical situation which calls for declaratory relief. . . . It seems clear that the declaratory relief statute was intended to relieve a party from exactly such a dilemma. Unless it can be availed of in a situation such as this, it will lose a large part of the value which, upon its enactment, was supposed to attach to it."

That principle was followed by the court of appeals in the later case.

It is plain that the trial court did not exceed its powers by its declaration of the rights, status and other legal relations of the parties in the contract involved herein.

For these reasons I dissent. The judgment should be affirmed.

[1]Reported in 73 P. (2d) 745.