[Nos. 42870, 42901.   En Banc.   January 4, 1974.]

WILLIAM J. FRITZ *et al., Appellants,* v. SLADE GORTON *et al., Respondents.*

WARREN SIMMONS *et al., Respondents,* v. SLADE GORTON *et al., Appellants.*

*Davis, Wright, Todd, Riese & Jones,* by *Richard A. Derham* and *Stephen K. Eugster,* for Fritz et al. and Simmons et al.

*Slade Gorton, Attorney General, Malachy R. Murphy, Deputy, Thomas F. Carr, Rodney Carrier, James K. Pharris, Robert F. Hauth, Wayne L. Williams,* and *James M. Vache, Assistants, Smith Troy, Prosecuting Attorney, Riddell, Williams, Voorhees, Ivie & Bullitt, Stimson Bullitt,* and *MacDonald, Hoague & Bayless,* by *Kenneth A. MacDonald, William H. Neukom,* and *Joel Benoliel,* for Gorton et al.

FINLEY, J.—In Supreme Court cause No. 42901, Simmons et al., and in Supreme Court cause No. 42870, Fritz et al., the plaintiffs assert that Initiative 276 (approved and enacted into law by a substantial majority of the electorate at the general election in November 1972) is unconstitutional on several grounds. The issues involved in both causes will be discussed, evaluated, and disposed of in this single, consolidated opinion.

In cause No. 42901, Simmons et al., Warren Simmons, a port district commissioner of the Port of Olympia, Richard Failor, a director or member of the school board of the North Thurston School District, Joel Gould, a commissioner of Public Utility District No. 1, and Marvin Jamerson, a commissioner of Thurston County Fire District No. 1, jointly filed a complaint in Thurston County Superior Court on January 27, 1973. Therein, the plaintiffs sought judicial declaratory relief under the Washington declaratory judgment act, RCW 7.24. They asked that Initiative 276, Laws of 1973, ch. 1, RCW 42.17, in its entirety, but particularly section 24, RCW 42.17.240 (public disclosure by elected public officials of their financial affairs) be declared uncon-

stitutional and void, and consequently not binding upon the plaintiffs. Marianne Kraft Norton sought intervention as a defendant ostensibly representing the people of the State of Washington and intervention was granted by the trial court. The Public Disclosure Commission created by Initiative 276 also sought and was granted intervention.

In Supreme Court cause No. 42870, Fritz et al., William J. Fritz, a professional lobbyist (employed by the Washington Food Processors Council and others as a lobbyist) and the Washington Food Processors Council, a voluntary association, became plaintiffs individually and in behalf of all others similarly situated. Their joint complaint was filed in the Superior Court of Thurston County on December 26, 1972. The complaint was amended and broadened on January 2, 1973. Plaintiffs asked for and were granted injunctive relief by the trial court restraining and enjoining pendente lite the application and enforcement of Initiative 276. In their complaint, the plaintiffs sought judicial-declaratory judgment relief comparable to that sought by plaintiffs in Simmons et al.; namely, that Initiative 276 (Laws of 1973, ch. 1, *codified as* RCW 42.17) in its entirety and particularly section 15, RCW 42.17.150, and section 17, RCW 42.17.170, and section 18, RCW 42.17.180 relative to lobbyists and employers of lobbyists—and expenditures relative to legislation—be declared unconstitutional and void. The League of Women Voters of Washington and the Public Disclosure Commission sought and were granted intervention.

Simmons et al. and Fritz et al. were combined and tried jointly with two other cases, Bare v. Gorton et al., Supreme Court cause No. 42879, and Young Americans for Freedom, Inc. v. Gorton et al., Supreme Court cause No. 42878, which cases also questioned Initiative 276 on constitutional grounds. Some facets of the cases are identical and common to all, others are different and unique as to each of the four cases. The combined cases were tried in Thurston County Superior Court, April 23 through May 2, 1973. The trial court rendered a memorandum opinion and subsequently

entered findings of fact, conclusions of law, and judgment holding that section 18, RCW 42.17.180, and section 40(4), RCW 42.17.400(4), the citizens suit for damages or the so-called "bounty hunter" provision of Initiative 276 were invalid. The trial court, however, sustained and upheld Initiative 276 against plaintiffs' attack on several other grounds of unconstitutionality. Appeals were timely filed in all four lawsuits. Because of statewide public interest in this litigation, the Chief Justice advanced the date for submission and hearing argument in the Supreme Court on Simmons et al. and Fritz et al. A request of counsel in both cases for continuance to an early date in the January 1974 term to allow more time for preparation of briefs was denied by the Chief Justice. Simmons et al. and Fritz et al. were treated as emergent matters and were heard by the court sitting en banc on November 12. Bare et al. v. Gorton, Supreme Court cause No. 42879, and Young Americans for Freedom v. Gorton, Supreme Court cause No. 42878, have been set and will be presented and argued during the next term of the court on January 28, 1974.

Direct action, legislative or otherwise, by the people, limiting or mandating government or official action to conform more closely with the needs and desires of people seems to be about as ancient and traditional as the history of organized society and government. In fact, the concept and practice of direct legislation by the people antedates recorded history. Shafer, *A Teutonic Institution Revived*, 22 Yale L.J. 398 (1913).

In our modern society many functions of an earlier, New England town meeting variety of pure democracy have been relinquished to the various modern institutions of our representative form of government. It is often forgotten— but it should be remembered as axiomatic—that our representative democracy exists and operates on the basis of its delegated authority and power derived from the people or the electorate of the states and the union. Sovereignty of the populace and the electorate relative to representative or organized government is dramatically evidenced in the

phrase "We the people . . . do ordain," contained in the preambles of the constitutions of the United States and the State of Washington. In this regard, it should be noted that where there is public dissatisfaction and/or disenchantment with the functioning or responsiveness of government institutions, to the social needs and desires of the electorate, power unquestionably has been reserved in the people or the electorate to alter the form and substance of the social compact by constitutional amendment. *See generally* A. DeTocqueville, *Democracy in America* (J. Mayer ed. 1971).

With this as part of our background or heritage relative to representative democracy and government, it is not surprising that in the area of political science and practical politics the concepts of initiative, referendum, and judicial recall became important tenets of the old "populist" movement. It was in the late 19th and the early 20th century that interest was sparked and an active and effective movement developed centering in the newer western states respecting direct legislative action by the electorate. Perhaps this was partly an outgrowth of the "populist" political movement and was partly due to then current popular dissatisfactions with an apparent lack of responsiveness of government to the social needs and desires felt by the people. The movement led to the adoption of state constitutional amendments providing for direct popular action in the nature of initiative, referendum, and judicial recall processes. The movement and developments in this regard were met with no small degree of vehement opposition by the writers, publicists, and pamphleteers of the day. *See, e.g.,* Littleton, *Mob Rule and the Canonized Majority,* 7 Const. Rev. 86 (1923). The more conservative elements of the legal profession feared the usurpation of constitutional safeguards and warned "[a] government controlled by hysteria and hasty impulse must inevitably fall." Campbell, *The Initiative and Referendum,* 10 Mich. L. Rev. 427, 436 (1912). Perhaps, on occasion, the electorate, in thinking and in action, has taken positions via the initiative or refer-

endum well in advance of, and perhaps more venturesome, than positions taken by state legislators. However, experience, patience, and maturity of judgment on the part of observers would seem to support a conclusion that the electorate generally has exercised its collective-coordinate legislative judgment and the powers of initiative and referendum with acumen, and common sense as well as with constructive social purpose equal to that of state legislatures.

In 1898, South Dakota, followed shortly by Oregon in 1902, became the first state to adopt by constitutional amendment the initiative procedure or machinery. By 1918, 22 states including Washington had adopted similar constitutional provisions. Potter, The "Tools of Democracy," 24 Case & Com. 610 (1918). It seems reasonably convincing that these developments were an outgrowth of popular discontent with the unresponsiveness of government in dealing with felt social needs of the people. The people of the State of Washington apparently experienced some of the current, popular dissatisfactions with the unresponsiveness of government through the traditional executive, legislative, and judicial modes of procedures, and amendment 7 of the Washington Constitution providing for direct legislation by initiative and referendum was adopted in 1912. In our decision in *Gottstein v. Lister*, 88 Wash. 462, 153 P. 595 (1915), we reviewed the history of the initiative and referendum movement and upheld amendment 7 against attack, on several grounds, of unconstitutionality. We recognized in *State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 P. 11 (1915), the role created for the people by amendment 7 was closely akin to that of a fourth branch of government. We have since recognized that the power of the people via initiative measures extends to the enactment of legislation in a very broad context unless specifically reserved to the legislature by the constitution. *State v. Paul*, 87 Wash. 83, 151 P. 114 (1915); *State v. Hinkle*, 156 Wash. 289, 286 P. 839 (1930).

In the thirties and early forties, the enactment of the federal social security act, 49 Stat. 620 (1935) and comparable or supplementary state legislation, Laws of 1935, ch.

182, recognized a broad spectrum of public welfare as a responsibility of government. Among other things, old age pensions, health and other benefits were recognized and afforded to senior citizens as a responsibility of government in an organized and previously unparalleled manner by the enactment of coordinated and complementary federal and state legislation. Senior citizens at the time were well organized and an influential group nationally and in many states, including Washington. In our state, the well organized and politically significant Senior Citizens League was dissatisfied with the ambit of benefits of the social security program for senior citizens of our state. Dissatisfaction concerned restrictive or austerity administrative concepts imposed by the 1939 Washington legislature, defining or prescribing basic economic or subsistence needs of social security recipients. Such legislative or administrative definitions of subsistence needs determined and limited the amount of the payments of benefits. *See* Laws of 1939, ch. 25. Thus, senior citizens and the league set about to modify the restrictions and to gain benefits more amenable to needs than were provided or funded even under the new and greatly improved coordinated federal and state social security program. The senior citizens and the league took their cause to the electorate of Washington via the initiative process. Initiative 141 resulted and was approved by the electorate. There was some surprise and even consternation in both official and in some unofficial circles. It was thought by some that serious policy, fiscal and other mistakes would be the result of the enactment by the people of Initiative 141. Some people even feared that sorely needed federal funds would be lost to Washington because of the lack of conformity of provisions of Initiative 141 with the standards prescribed by the federal social security act. However, Initiative 141 was a clear and direct response of the people, including senior citizens, to what they considered was an inadequate government response to the needs of old-age pensioners in our state. After some serious litigation in the courts and with some necessary interpretative

modification, Initiative 141 was accorded legal status and effect. *See, e.g., O'Neil v. Department of Social Security*, 12 Wn.2d 334, 121 P.2d 396 (1942); Attorney General Opinion, November 30, 1940. This occurred although at the time some aspects of the initiative seemed to be serious mistakes of policy which could significantly disadvantage the real proponents of Initiative 141, as well as the entire citizenry. *See generally* Comment, *Old Age Assistance in Washington*, 16 Wash. L. Rev. 95 (1941).

■ It should be obvious that the electorate, via the initiative and direct legislation, can make serious, even grievous, mistakes and errors in judgment regarding matters of basic social policy including unwise and even grievous errors relative to fiscal policy and the solvency of government itself. However, state legislators, acting in their capacity as the duly elected representatives of the people, although well intentioned, are not always infallible in all matters of legislative import. It is certainly not the function or prerogative of the courts to second guess and substitute their judgment at every turn of the road for the judgment of legislators in matters of legislation. So it is, or should be, in the case of direct legislation by the people via the initiative process. Some of the same social and political considerations and factors which prompted numerous state constitutional amendments providing for direct legislation by the people via the initiative and referendum processes were extant at the time Initiative 141 was enacted by the electorate. The same factors and considerations exist today, *i.e.,* public dissatisfactions with government and its imagined or real unresponsiveness to social needs and to the desires and will of the people. This, of course, is coupled with today's accelerated distrust of public officials and government. These facets of modern life in our society rather obviously contributed significantly to the origin, and adoption by the electorate of Initiative 276.

It has been said time and again in our history by political and other observers that an informed and active electorate is an essential ingredient, if not the *sine qua non* in regard

to a socially effective and desirable continuation of our democratic form of representative government. There certainly have been more obstacles in the past to the realization of an informed, active, and participating electorate than at the present time. With the advent of television and its technically proficient development today, and with dramatic improvements in our other modes of dissemination of information about government to the public, the dream and the faith of our founding fathers in an informed, active and participating electorate comes closer to realization today than at any other time in our history.

With improved means and methods of communication there is little reason to doubt that a substantial percentage of the public is better informed, more alert, interested, and, in fact, concerned today with matters of government than ever before in our history. We can note particularly that in recent years there has been more dissemination to the public of information as to campaign contributions and expenditures and the use and misuse thereof in the election of public officials. There has been more information about the proper and improper function of lobbying activities, in the decision-making processes of government, and more particularly in the enactment or nonenactment of legislation. There has been an increasing emphasis on the importance of the role of money, funds, and finances in regard to the aforementioned matters. There has been much emphasis on the importance of the availability of public information, public records, the right of the public to know. As a culmination of public interest and concern along the lines indicated, and due to the availability of the initiative process in our state, the electorate adopted Initiative 276 at the election in 1972 by a substantial majority of the votes cast. A pertinent part of this background is illustrated by the interesting account of how Initiative 276 came about in an excerpt from the brief of appellant Marianne Kraft Norton:

A. *The People Legislate for Open Government.* In the spring of 1971, following the close of the 1971 state legis-

lative session, various citizens groups[2] concerned about the problem of the impact and influence of money and property on governmental decision making formed a common purpose organization called the Coalition for Open Government ("COG") to explore the possibility of drafting an initiative to solve this problem by requiring public disclosures of campaign financing, lobbyist registration and reporting, elected officials' financial affairs and public records affording to the people "the public's right to know." In the summer and fall of 1971, COG undertook the drafting of such an initiative measure and in order to generate full public information about it, COG participated in public meetings, solicited input from member citizen organizations and others, and distributed press releases about the initiative to news media. In November and December of 1971 COG mailed to organizations and representative concerned citizens (including all members of the state legislature) 3,000 copies of its letter . . . describing its approach to solving the above-described problem, and requesting responses from the addressees.

In February of 1972 with its February 8, 1972 letter . . . COG made another appeal to the state legislature, then in extraordinary session, for a law to rectify suspicions by citizens about the effect of money on the political and governmental processes, a law to correct abuses in the system frustrating "the people's right to know." When the legislature failed to respond with what COG would have considered adequate legislation, COG proceeded to file the initiative in late March 1972. A successful signature drive ensued. The campaign in the summer and fall . . . involved the distribution of materials, . . . more public meetings, with endorsements by government officials, organized labor, citizens organizations including political party groups and editorial support.

2. American Association of University Women (3,200 members in Washington State Chapter, St. 415b); League of Women Voters of Washington (3,000 members, St. 415b); the Municipal League of Seattle and King County (3,500 to 4,000 members, St. 357); Common Cause (4,500 members in Washington, St. 415b); Young Republicans of King County (200-300 members, St. 358); The Washington Environmental Council (2,000-4,000 members, St.

358); the Washington State Council of Churches; the Seattle Press Club; CHEC-Choose an Effective City Council (approximately 1,000 members, St. 358); Seattle-King County Bar Association, Young Lawyers Section.

The reporting, public disclosure, public information and other requirements of Initiative 276 are new, novel, and, in a comparative sense, most extensive and very, very detailed. Compliance with them will require a considerable degree of painstaking care and effort on the part of the candidate for public office, public officials, lobbyists, employers of lobbyists, and others. The requirements of section 24 will necessitate not only disclosure of financial facts and information of a very personal and private nature insofar as individual public officials are concerned but also mandates the disclosure of financial information heretofore regarded as personal and private as to spouses, business and professional partners or associates of individual public officials. The latter kind of public disclosure of financial information may prove to be highly undesirable from a personal as well as a business or professional standpoint on the part of spouses, business and professional associates of the individual public officials involved. It may very well prove to be the case that spouses, business and professional associates of public officials may not only prefer not to disclose but may refuse to disclose, not for ulterior, unethical, or illegal reasons but for purely personal and business reasons the required critical information as to their financial affairs. It was urged in briefs and argument, and it is not inconceivable, that many very dedicated, highly motivated public officials of unquestionable honesty, integrity and rectitude may simply not be able to disclose the type of information required by Initiative 276 relative to spouses and associates. Furthermore, it has been noted that such public officials may have to choose between one or the other of two unpleasant and, perhaps undesirable alternatives. (1) They would either have to terminate business, professional, or perhaps, even marital relationships, or (2) they would be forced to resign their office, to forego and

give up dedicated and meaningful careers as public officials and servants. There may be some thin difference between possibilities and probabilities in this regard. But, Initiative 276 is not without the possibility of some real problems which may ultimately produce negative rather than affirmative results insofar as the best interests of the public are concerned. Hence, the well-intentioned motives of the proponents and of those who voted for Initiative 276 may prove to be self-defeating. In other words, improvement in the quality of government may not be enhanced, but could be seriously discounted or diminished despite the well-intentioned purposes and desires of those who supported and approved Initiative 276. Obviously we are not speaking of certainties or even of probabilities but possibilities. In the face of such possibilities, we are convinced that two things must be said and emphasized. First, the electorate of our state in legislating directly by the initiative route, as in the case of duly elected legislative representatives, is not infallible. They, even as legislators, must be accorded some margin of error as to matters of policy-judgment and in terms of making legislative mistakes. Second, it is not the prerogative nor the function of the judiciary to substitute what they may deem to be their better judgment for that of the electorate in enacting initiatives or for the judgment of duly elected legislators unless the errors in judgment clearly contravene state or federal constitutional provisions. For the reason indicated and discussed with more particularity hereinafter, we are convinced that the trial court must be reversed in voiding section 40(4) and section 18 of Initiative 276 and must be affirmed in sustaining the constitutionality of other provisions of Initiative 276 under attack on grounds of unconstitutionality in Simmons et al. and in Fritz et al.

WASHINGTON CONSTITUTION, ARTICLE 2, SECTION 19

The threshold question in both Simmons and Fritz involves article 2, section 19 of the state constitution which reads:

BILL TO CONTAIN ONE SUBJECT. No bill shall embrace more

than one subject, and that shall be expressed in the title.

The challengers of Initiative 276 basically contend that article 2, section 19 applies to initiative measures with the same force and import as in the case of enactments of the state legislature. From this thesis, the challengers argue that Initiative 276 (1) embraces more than one subject, and (2) that the subject matter within the body of the initiative is not expressed in the ballot title of the initiative. On the basis of these assumptions they conclude that the initiative violates article 2, section 19, and consequently it is unconstitutional and void.

The reasoned decision of this court in *Senior Citizens League v. Department of Social Security*, 38 Wn.2d 142, 228 P.2d 478 (1951), clearly held that article 2, section 19 is not applicable to initiative measures. In this connection, the court explicitly recognized the limited application of the constitutional article to the legislative titles of bills or laws enacted by the state legislature. Because Initiative 276 originated with the signing and filing of petitions by the voters of Washington rather than through any action by the legislature, the initiative had no legislative title. It did have, however, a ballot title provided by the Attorney General's Office. The adequacy of ballot titles is specifically governed by the provisions of RCW 29.79.040. These provisions mandate the procedures to be followed by the Attorney General in providing a legally sufficient ballot title for initiative measures. RCW 29.79.040 provides as follows:

Ballot title—Formulation by attorney general. Within ten days after the receipt of an initiative or referendum measure the attorney general shall formulate therefor and transmit to the secretary of state a statement of not to exceed one hundred words, bearing the serial number of the measure. *The statement may be distinct from the legislative title of the measure, and shall express, and give a true and impartial statement of the purpose of the measure;* it shall not be intentionally an argument, nor likely to create prejudice, either for or against the measure. In addition to such statement, the attorney general shall also prepare a caption, not to exceed five words in

length, to permit the voters readily to identify the initiative or referendum measure and distinguish it from other questions on the ballot. This caption and the statement together shall constitute the ballot title. The ballot title formulated by the attorney general shall be the ballot title of the measure unless changed on appeal.

(Italics ours.) No contention is made by the challengers of Initiative 276 that its ballot title does not comply with the above provisions of RCW 29.79.040. We decline to overrule and strike down the well-considered en banc decision of the court in *Senior Citizens League v. Department of Social Security, supra.* We adhere to the precedent established by that case that article 2, section 19 does not apply to ballot titles of initiative measures.[1] We think this resolves and should end this aspect of the appeals in Simmons and in Fritz.

Assuming arguendo, however, that the provisions of article 2, section 19 are applicable, we would have no difficulty in holding that the ballot title and subject matter of Initiative 276 comply with the twofold requirements of article 2, section 19. The ballot title of Initiative 276 as drafted per the Attorney General pursuant to RCW 29.79.040 reads as follows:

AN ACT Relating to campaign financing, activities of lobbyists, access to public records, and financial affairs of elective officers and candidates; requiring disclosure of sources of campaign contributions, objects of campaign expenditures, and amounts thereof; limiting campaign expenditures; regulating the activities of lobbyists and requiring reports of their expenditures;

[1]Article 2, section 19 is not the only constitutional provision which does not apply to initiative and referendum enactments. In *State ex rel. Lofgren v. Kramer,* 69 Wn.2d 219, 417 P.2d 837 (1966), we held that amendment 7, section 1(d) impliedly precluded gubernatorial veto of a referendum before referral to the electorate. As amendment 7, section 1(d) explicitly removes the veto power after passage at the polls, we reasoned that veto before the referendum was passed upon by the people would render the section meaningless. For a broad discussion of the evolution of the initiative and referendum process in Washington, *see* Trautman, *Initiative and Referendum in Washington: A Survey,* 49 Wash. L. Rev. 55 (1973).

restricting use of public funds to influence legislative decisions; governing access to public records; specifying the manner in which public agencies will maintain such records; requiring disclosure of elective officials' and candidates' financial interests and activities; establishing a public disclosure commission to administer the act; and providing civil penalties.

The challenging parties assert that the body of the initiative covers a "multitude of subjects" including: (1) disclosure of campaign financing; (2) limitations on campaign spending; (3) regulation of lobbying activities; (4) regulation of grass roots educational activities; (5) disclosure of financial affairs of elected officials; and (6) public inspection of public records.

■ We do not agree that the initiative covers a multiplicity of subjects or subjects that are not reasonably related. On the contrary, each of the subtopics of Initiative 276 bears a close interrelationship to the dominant intendment of the measure. We have repeatedly held that

> where the title embraces a general subject it is not violative of the constitution even though the general subject contains incidental subjects. All that is required is that there be some "rational unity" between the general subject and the incidental subdivisions. *Kueckelhan v. Federal Old Line Ins. Co.*, 69 Wn.2d 392, 418 P.2d 443 (1966); *Robison v. Dwyer*, 58 Wn.2d 576, 364 P.2d 521 (1961).

*Water Dist. 105 v. State*, 79 Wn.2d 337, 341, 485 P.2d 66 (1971).

In short, we are satisfied that the interrelated sections easily meet the nexus requirements of the "rational unity" test. In our opinion, the general subject area of Initiative 276 was one reasonably well known and understood by the public. We think that the generic subject of Initiative 276 —openness in government—necessarily encompasses the public accountability of incumbents of public office and candidates seeking to represent the people in public office as well as lobbyists and their employers seeking to guide or direct legislation. Hence, the "rational unity" or coalescence of the initiative's subtopics could be expressed as a general

subject or subject area delineating or prescribing more realistic standards and controls, better and more available public information and records regarding election campaigns, the functions of government, involving the activities and societal responsibilities of candidates for public office, public officials, lobbyists and others actively engaged in the processes of government. *Accord, Stein v. Howlett,* 52 Ill. 2d 570, 289 N.E.2d 409 (1972), *cert. denied,* 412 U.S. 925 (1973) (Illinois public disclosure law, discussed *infra*); *Madison Nat'l Bank v. Newrath,* 261 Md. 321, 275 A.2d 495 (1971) (Uniform Commercial Code with its divers subject matter held to satisfy Maryland's one subject rule).

The second requirement of article 2, section 19, that the subject of the bill be expressed in its title, is clearly met. The adequacy of legislative titles in terms of the provisions of article 2, section 19 was addressed in *Maxwell v. Lancaster,* 81 Wash. 602, 607, 143 P. 157 (1914). In *Lancaster* the court stated, "[i]f the subject of the act can be reasonably gathered from reading the title as a whole, the subject is sufficiently expressed therein." The lengthy, detailed and explicit ballot title given Initiative 276 by the Attorney General's Office leaves no doubt in our minds that a reasonably careful and intelligent reader would be informed as to what was covered or embraced in the body of Initiative 276.

Thus, assuming for argument's sake that article 2, section 19 is applicable to Initiative 276 we would conclude hypothetically that the initiative and its title would be in compliance.

INITIATIVE SECTION 24 (RCW 42.17.240)

In the Simmons case, arguments of respondents against Initiative 276 focus primarily upon the constitutionality of section 24 which is set out in full in the footnote herein.[2]

---

[2]"Sec. 24. ELECTED OFFICIALS REPORTS OF FINANCIAL AFFAIRS. (1) Every elected official (except President, Vice President and precinct committeemen) shall on or before January 31st of each year, and every candidate (except for the offices of President, Vice President and precinct committeeman) shall, within two weeks of becoming a candidate,

Respondent's contentions that section 24 is unconstitutional are essentially as follows: (1) the section infringes upon a fundamental right of privacy; (2) the section is

file with the commission a written statement sworn as to its truth and accuracy stating for himself and his immediate family for the preceding twelve months:

"(a) Occupation, name of employer, and business address; and

"(b) Each direct financial interest in excess of five thousand dollars in a bank or savings account or cash surrender value of any insurance policy; each other direct financial interest in excess of five hundred dollars; and the name, address, nature of entity, nature and value of each such direct financial interest; and

"(c) The name and address of each creditor to whom the value of five hundred dollars or more was owed; the original amount of each debt to each such creditor; the amount of each debt owed to each creditor as of the date of filing; the terms of repayment of each such debt; and the security given, if any, for each such debt: PROVIDED, that debts arising out of a "retail installment transaction" as defined in chap. 63.14 R.C.W. (Retail Installment Sales Act) need not be reported; and

"(d) Every public or private office, directorship and position as trustee held; and

"(e) All persons for whom actual or proposed legislation, rules, rates, or standards has been prepared, promoted, or opposed for current or deferred compensation; the description of such actual or proposed legislation, rules, rates or standards; and the amount of current or deferred compensation paid or promised to be paid; and

"(f) The name and address of each governmental entity, corporation, partnership, joint venture, sole proprietorship, association, union, or other business or commercial entity from whom compensation has been received in any form of a total value of five hundred dollars or more; the value of such compensation; and the consideration given or performed in exchange for such compensation; and

"(g) The name of any corporation, partnership, joint venture, association, union or other entity in which is held any office, directorship or any general partnership interest, or an ownership interest of ten percent or more; the name or title of that office, directorship or partnership; the nature of ownership interest; and with respect to each such entity the name of each governmental entity, corporation, partnership, joint venture, sole proprietorship, association, union or other business or commercial entity from which such entity has received compensation in any form in the amount of five hundred dollars or more during the preceding twelve months and the consideration given or performed in exchange for such compensation; and

"(h) A list, including legal descriptions, of all real property in the State of Washington, the assessed valuation of which exceeds two thousand five hundred dollars in which any direct financial interest was ac-

impermissibly overbroad; (3) the section impinges upon a candidate's right to seek and hold office, and (4) the right of the electorate to vote for the candidate of its choice.

The bold thrust of Initiative 276 in mandating disclosure of the financial affairs of elected officials appears to be unprecedented in either state or federal legislation. In an ideal sense, public disclosure legislation should not totally

quired during the preceding calendar year, and a statement of the amount and nature of the financial interest and of the consideration given in exchange for such interest; and

"(i) A list, including legal descriptions, of all real property in the State of Washington, the assessed valuation of which exceeds two thousand five hundred dollars in which any direct financial interest was divested during the preceding calendar year, and a statement of the amount and nature of the consideration received in exchange for such interest, and the name and address of the person furnishing such consideration; and

"(j) A list, including legal descriptions, of all real property in the State of Washington, the assessed valuation of which exceeds two thousand five hundred dollars in which a direct financial interest was held: PROVIDED, that if a description of such property has been included in a report previously filed, such property may be listed, for purposes of this provision, by reference to such previously filed report;

"(k) A list, including legal descriptions, of all real property in the State of Washington, the assessed valuation of which exceeds five thousand dollars, in which a corporation, partnership, firm, enterprise or other entity had a direct financial interest, in which corporation, partnership, firm or enterprise a ten percent or greater ownership interest was held; and

"(1) Such other information as the commission may deem necessary in order to properly carry out the purposes and policies of this act, as the commission shall by rule prescribe.

"(2) Where an amount is required to be reported under subsection (1), paragraphs (a) through (k) of this section, it shall be sufficient to comply with such requirement to report whether the amount is less than one thousand dollars, at least one thousand dollars but less than five thousand dollars, at least five thousand dollars but less than ten thousand dollars, at least ten thousand dollars but less than twenty-five thousand dollars, or twenty-five thousand dollars or more. An amount of stock may be reported by number of shares instead of by market value. No provision of this subsection shall be interpreted to prevent any person from filing more information or more detailed information than required.

"(3) Elected officials and candidates reporting under this section shall not be required to file the statements required to be filed with the Secretary of State under R.C.W. 42.21.060."

disregard the right of privacy of candidates for office and incumbent elected public officials whose compliance is required by such legislation. Furthermore, in the abstract, there should be an optimum balance between the rights of such candidates and elected officials and the right of the public to know or to be informed about those who govern in their behalf. In its declaration of policy, Initiative 276 notes as its goal the achievement of such a balance. *See* section 1(10)-(11), RCW 42.17.010(10)-(11).

Some ambivalence, line drawing or balancing as to conflicting values and opposing interests usually can be tolerated or subsumed with some ease and grace in the realm of the abstract or the purely philosophical. But the task is a most sensitive, difficult, and at times a well nigh impossible one, in the day-to-day—at times—do or die world of practical, political, and social realities. For reasons indicated hereinafter, we have some doubts as to whether the difficult task of judicial line drawing or balancing is required as to any conflicting values and opposing interests involved in section 24. If some judicial line drawing or balancing must be done, we are convinced it must be done in the direction or in support of the interests of the people and the electorate regarding the purport of section 24. Considering today's political and social realities and the purport of section 24, we are convinced the sum of these circumstances show very clearly a legitimate or perhaps even a compelling state or societal interest of the people and the electorate in enacting Initiative 276, including section 24 thereof.

The right of privacy, as with other rights, is not an absolute. There are inherent limitations of a unique and significant nature regarding any claim to the right of privacy on the part of candidates and incumbent public officials. It seems almost too obvious for argument that the candidate who enters the public arena voluntarily presents or thrusts himself forth as a subject of public interest and scrutiny. While there are many intimate details which may be beyond the scope of legitimate public interest, information which clearly and directly bears upon the qualifica-

tions and the fitness of those who seek and hold public office is unquestionably in the public domain.

First amendment freedom of the press has been dramatically construed to encourage and protect public discourse regarding the conduct of public officials. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), the Supreme Court of the United States quoted with approval the language of *Sweeney v. Patterson,* 128 F.2d 457 (D.C. Cir.), *cert. denied,* 317 U.S. 678 (1942), in which the circuit court had approved the dismissal of a congressman's libel suit against a newspaper,

> "Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. . . . *The interest of the public here outweighs the interest of appellant or any other individual. The protection of the public requires not merely discussion, but information.*"

(Italics ours.) *New York Times Co. v. Sullivan, supra* at 272.

In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 41-42, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971), the court further elucidated the fundamental nature of the public's right to know:

> Self-governance in the United States presupposes far more than knowledge and debate about the strictly official activities of various levels of government. The commitment of the country to the institution of private property, protected by the Due Process and Just Compensation Clauses in the Constitution, places in private hands vast areas of economic and social power that vitally affect the nature and quality of life in the Nation. Our efforts to live and work together in a free society not completely dominated by governmental regulation necessarily encompass far more than politics in a narrow sense. . . . "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigen-

cies of their period." *Thornhill v. Alabama,* 310 U.S. 88, 102 (1940).

. . . [L]ater decisions have disclosed the artificiality, in terms of the public's interest, of a simple distinction between "public" and "private" individuals or institutions:

"Increasing in this country, the distinctions between governmental and private sectors are blurred. . . . In many situations, policy determinations which, traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government. This blending of positions and power has also occurred in the case of individuals so that many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions. . . .

". . . Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.'" *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 163-164 (1967) (Warren, C.J., concurring in result).

The crux of evaluating the capabilities and motivations of any candidate for public office or incumbent public official is *information* bearing upon fitness for office. We need not fear that any candidate or official may not apprise the electorate of his capabilities. Opponents, of course, will emphasize any lack of ability. Nonetheless, other factors that may influence the electorate's evaluative processes are not always disclosed in the heat of a campaign and less often when the official has taken office.

█ We accept as self-evident the suggestion in the brief of intervenors (The League of Women Voters) that the right to receive information is the fundamental counterpart of the right of free speech. The broad protections accorded the speech of public officials, *Bond v. Floyd,* 385 U.S. 116, 17 L. Ed. 2d 235, 87 S. Ct. 339 (1966), and the criticism of such speech, *Garrison v. Louisiana,* 379 U.S. 64, 13 L. Ed. 2d

125, 85 S. Ct. 209 (1964), are essential to ensure "that debate on public issues should be uninhibited, robust, and wide-open . . ." *New York Times Co. v. Sullivan, supra* at 270. The constitutional safeguards which shield and protect the communicator, perhaps more importantly also assure the public the right to *receive* information in an open society. *Time, Inc. v. Hill,* 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967). Freedom of speech without the corollary —freedom to receive—would seriously discount the intendment, purpose and effect of the First Amendment.[3]

---

[3]The right to receive information, or the right of the people to know, has been repeatedly recognized by the United States Supreme Court as a fundamental tenet of the American political system:

> [T]he Constitution protects the right to *receive* information and ideas. "This freedom [of speech and press] . . . necessarily protects the right to receive. . . ." [citations omitted] This right to *receive* information and ideas, regardless of their social worth [citation omitted] is fundamental to our free society.

(Italics ours.) *Stanley v. Georgia,* 394 U.S. 557, 564, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969).

> It is the right of the *viewers and listeners,* not the right of the broadcasters, which is paramount. [citations omitted] . . . It is the right of the public to *receive* suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.

(Italics ours.) *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969).

> Those guarantees are not for the benefit of the press so much as for the benefit of all of us.

*Time, Inc. v. Hill,* 385 U.S. 374, 389, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967).

> The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to *receive,* the right to read . . .

(Italics ours.) *Griswold v. Connecticut,* 381 U.S. 479, 482, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965).

> I think the right to *receive* publications is such a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to *receive* and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.

(Italics ours.) *Lamont v. Postmaster General,* 381 U.S. 301, 308, 14 L. Ed. 2d 398, 85 S. Ct. 1493 (1965). (Brennan, J., concurring.)

> This freedom [the First Amendment] embraces the right to distri-

Initiative 276 seeks to enlarge the information base upon which the electorate makes its decisions. The right of the electorate to know most certainly is no less fundamental than the right of privacy. When the right of the people to be informed does not intrude upon intimate personal matters which are unrelated to fitness for public office, *see* *Griswold v. Connecticut,* 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965), the candidate or officeholder may not complain that his own privacy is paramount to the interests of the people.

Discernment between the ambit of private and personal affairs is not an easy task. As stated in *Garrison v. Louisiana,* 379 U.S. 64, 77, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964):

> [A]ny criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.

The scope of public interest and the public's right to know was further emphasized in *Monitor Patriot v. Roy,* 401 U.S. 265, 274, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971), when the court stated:

> The principal activity of a candidate in our political system, his "office," so to speak, consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him. A candidate who, for example, seeks to further his cause through the prominent display of his

bute literature [citation omitted] and necessarily protects the right to *receive* it.

(Italics ours.) *Martin v. Struthers,* 319 U.S. 141, 143, 87 L. Ed. 1313, 63 S. Ct. 862 (1943).

wife and children can hardly argue that his qualities as a husband or father remain of "purely private" concern. And the candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary.

The provisions of section 24 do not sweep so broadly as to be constitutionally impermissible. Section 24 does not cavalierly mandate a picayune itemization of personal affairs, but requires only the listing of financial data and relationships with amounts to be designated, not in specific amounts, but by general categories of varying monetary degree. *See* section 24, *supra.* Further, we note that should the requirements of section 24 impose undue hardship upon any individual, the Public Disclosure Commission is empowered to grant a waiver. *See* section 37 (9), RCW 42.17.370 (9).

The supreme courts of California and Illinois have passed upon the constitutionality of public disclosure measures in those states; but, the unique nature, breadth and complexity of Initiative 276 discounts the precedential value of those decisions in some considerable degree.

In *Carmel-by-the-Sea v. Young,* 2 Cal. 3d 259, 466 P.2d 225, 85 Cal. Rptr. 1 (1970), a public disclosure enactment was struck down as unconstitutional. Among other distinguishing features, the California case involved a state statute which compelled extensive disclosure by nonelected state employees. Thus, civil servants who had not taken the volitional step of entering the elective process were to be subjected to scrutiny equal to that of elected officials. The California court emphasized and held that this intrusion into the lives of public employees was an unwarranted and unconstitutional invasion of privacy.

The Illinois Supreme Court in *Stein v. Howlett,* 52 Ill. 2d 570, 289 N.E.2d 409 (1972), *cert. denied,* 412 U.S. 925 (1973), distinguished *Carmel* by interpreting a newly enacted Illinois government ethics act upon the basis of a unique provision in the 1970 Illinois constitution. The Illi-

nois court reasoned that this constitutional provision, which ordered disclosure of economic data by all candidates and officeholders, was clear evidence of a recent popular mandate favoring disclosure, and constituted authority to sustain the Illinois disclosure legislation.

■ The salient precedential value of the *Stein* decision was the court's refusal to find the provisions of the Illinois statute either (1) an unwarranted intrusion into the privacy of candidates or public officeholders, or (2) an impermissible infringement upon the right to seek office or to vote for the candidate of one's choice. With regard to the ambit of section 24 of Initiative 276, we subscribe to the rationale and holding of the Illinois Supreme Court.

The respondents argue that section 24 suffers from unconstitutional overbreadth. Obviously, the extensive reporting required by section 24 may result in disclosures of information not unequivocally related to the public office in question. Respondents assert the initiative does not sufficiently relate required disclosure to the nature of the office. It would be, however, an insurmountable legislative task to tailor disclosures to each of literally a myriad of public posts, and an anomaly to require each individual to make a personal determination as to what items of his financial affairs would be relevant. The all-inclusive, generic terms of section 24 are not irrationally unrelated to the legitimate purpose they are to achieve. We, therefore, decline the invitation to find the section unconstitutionally overbroad. *Accord, Stein v. Howlett, supra.*

Our holding that section 24 is not repugnant to the right of privacy or other constitutional rights of public officials, does not signify we would personally endorse the philosophy or the mechanics of that section if other alternatives were offered. It may well be that application and enforcement of the section will have negative, as well as affirmative social results. In any event, it is not for this court to substitute its judgment in matters of social or political policy for those of the people and the society it serves. Respondents earnestly warn of statewide wholesale resigna-

tions by dedicated, scrupulously honest, competent public officials if section 24 is upheld. In examining the extensive disclosure requirements of the section, we note the requirement of exhaustive, burdensome reporting that may befall some individuals.

Section 24 may impose an extraordinary impact upon those who are engaged both in the public service and in private business or the professions, and whose associates and immediate family members are subject to disclosure. As heretofore mentioned, the partners, business associates and spouses of public officials may refuse to make the necessary disclosures. Faced with this dilemma as to extensive disclosure of financial affairs in order to continue in office, an unpredictable number of elected officials may resign and forego public service. Thus, again as mentioned heretofore, section 24 may foreclose the candidacy or continued office holding of well qualified citizens of impeccable integrity. It would indeed be sadly ironic if the laudable purposes of Initiative 276 were to precipitate significant or widespread resignations from public office of many outstanding, honest and competent officials.

Irrespective of how ill advised we or others may think some portions of section 24 may be, it is within the power of the people to prescribe informational standards or disclosure qualifications relative to public office. In this regard, we noted that the waiver of compliance authorized by section 37(9), RCW 42.17.370(9), may provide a safety valve to ensure that inequities do not frustrate the purpose of the measure.

It is to be hoped that some of the fears expressed by respondents are unwarranted. If not, constitutional amendment 26 provides the mechanism to remedy undesirable social results which may flow from application and enforcement of section 24 or other provisions of Initiative 276. In fact, at the coming January 1974 session, the legislature may modify or change any demonstrably unworkable, undesirable, or offensive provisions by a two-thirds vote of

each house. Furthermore, after the initiative has been on the books for 2 years it may be changed by a simple majority vote of each house. In addition, the people could again resort to the initiative process as they deem it necessary to alter and improve upon the provisions of Initiative 276 as their legislative product.

INITIATIVE SECTIONS 15, 17 AND 18—LOBBYING ACTIVITIES

In Fritz, the gravamen of the appellants' complaint centers upon the provisions of Initiative 276 which affect lobbying activities. Specifically, these are section 15, RCW 42.17.150, which requires detailed registration by lobbyists; section 17, RCW 42.17.170, which includes extensive reporting of lobbying activities; and section 18, RCW 42.17.180, under which the employers of lobbyists are obligated to report compensation paid directly or indirectly to candidates or public officials.[4]

---

[4]"Sec. 15. REGISTRATION OF LOBBYISTS. (1) Before doing any lobbying, or within thirty days after being employed as a lobbyist, whichever occurs first, a lobbyist shall register by filing with the commission a lobbyist registration statement, in such detail as the commission shall prescribe, showing:

"(a) His name, permanent business address, and any temporary residential and business addresses in Thurston County during the legislative session;

"(b) The name, address and occupation or business of the lobbyist's employer;

"(c) The duration of his employment;

"(d) His compensation for lobbying; how much he is to be paid for expenses, and what expenses are to be reimbursed; and a full and particular description of any agreement, arrangement or understanding according to which his compensation, or any portion thereof, is or will be contingent upon the success of any attempt to influence legislation.

"(e) Whether the person from whom he receives said compensation employs him solely as a lobbyist or whether he is a regular employee performing services for his employer which include but are not limited to the influencing of legislation;

"(f) The general subject or subjects of his legislative interest;

"(g) A written authorization from each of the lobbyist's employers confirming such employment;

"(h) The name and address of the person who will have custody of the accounts, bills, receipts, books, papers, and documents required to be kept under this act;

"(i) If the lobbyist's employer is an entity (including, but not

Appellants earnestly contend that their First Amendment right *to petition government* as extended to the states

limited to, business and trade associations) whose members include, or which as a representative entity undertakes lobbying activities for, businesses, groups, associations, or organizations, the name and address of each member of such entity or person represented by such entity whose fees, dues, payments or other consideration paid to such entity during either of the prior two years have exceeded five hundred dollars or who is obligated to or has agreed to pay fees, dues, payments or other consideration exceeding five hundred dollars to such entity during the current year.

"(2) Any lobbyist who receives or is to receive compensation from more than one person for his services as a lobbyist shall file a separate notice of representation with respect to each such person; except that where a lobbyist whose fee for acting as such in respect to the same legislation or type of legislation is, or is to be, paid or contributed to by more than one person then such lobbyist may file a single statement, in which he shall detail the name, business address and occupation of each person so paying or contributing, and the amount of the respective payments or contributions made by each such person.

"(3) Whenever a change, modification, or termination of the lobbyist's employment occurs, the lobbyist shall, within one week of such change, modification or termination, furnish full information regarding the same by filing with the commission an amended registration statement.

"(4) Each lobbyist who has registered shall file a new registration statement, revised as appropriate, each January, and failure to do so shall terminate his registration."

"Sec. 17. REPORTING BY LOBBYISTS. (1) Any lobbyist registered under section 15 of this act and any person who lobbies shall file with the commission periodic reports of his activities signed by both the lobbyist and the lobbyist's employers. The reports shall be made in the form and manner prescribed by the commission. They shall be due quarterly and shall be filed within thirty days after the end of the calendar quarter covered by the report. In addition to the quarterly reports, while the legislature is in session, any lobbyist who lobbies with respect to any legislation shall file interim weekly periodic reports for each week that the legislature is in session, which reports need be signed only by the lobbyist and which shall be filed on each Tuesday for the activities of the week ending on the preceding Saturday.

"(2) Each such quarterly and weekly periodic report shall contain:

"(a) The totals of all expenditures made or incurred by such lobbyist or on behalf of such lobbyist by the lobbyist's employer during the period covered by the report, which totals shall be segregated according to financial category, including food and refreshments; living accommodations; advertising; travel; telephone; contributions; office expenses, including rent and the salaries and wages paid for staff and secretarial assistance, or the proportionate amount thereof, paid or

by the Fourteenth Amendment is violated by the registration and reporting requirements of sections 15, 17, and 18.

incurred for lobbying activities; and other expenses or services: PROVIDED HOWEVER, that unreimbursed personal living and travel expenses of a lobbyist not incurred directly or indirectly for any lobbying purpose need not be reported: and PROVIDED FURTHER, that the interim weekly reports of legislative lobbyists for the legislative session need show only the expenditures for food and refreshments; living accommodations; travel; contributions; and such other categories as the commission shall prescribe by rule. Each individual expenditure of more than fifteen dollars for entertainment shall be identified by date, place, amount, and the names of all persons in the group partaking in or of such entertainment including any portion thereof attributable to the lobbyists's participation therein but without allocating any portion of such expenditure to individual participants.

"(b) In the case of a lobbyist employed by more than one employer, the proportionate amount of such expenditures in each category incurred on behalf of each of his employers.

"(c) An itemized listing of each such expenditure in the nature of a contribution of money or of tangible or intangible personal property to any legislator, or for or on behalf of any legislator. All contributions made to, or for the benefit of, any legislator shall be identified by date, amount, and the name of the legislator receiving, or to be benefited by each such contribution.

"(d) The subject matter of proposed legislation or rulemaking; the proposed rules, standards, rates or other legislative enactments under chap. 34.04 R.C.W. and chap. 28B.19 R.C.W. (the state Administrative Procedure Acts) and the state agency considering the same; and the number of each senate or house bill, resolution, or other legislative activity which the lobbyist has been engaged in supporting or opposing during the reporting period; PROVIDED, that in the case of appropriations bills the lobbyist shall enumerate the specific section or sections which he supported or opposed."

"Sec. 18. REPORTS BY EMPLOYERS OF REGISTERED LOBBYISTS. Every employer of a lobbyist registered under this act shall file with the commission on or before January 31st of each year a statement disclosing for the preceding twelve months the following information:

"(1) The name of each elected official, candidate, or any member of his immediate family to whom such employer has paid any compensation, the value of such compensation and the consideration given or performed in exchange for such compensation.

"(2) The name of any corporation, partnership, joint venture, association, union or other entity of which any elected official, candidate, or any member of his immediate family is a member, officer, partner, director, associate or employee and to which the employer has paid compensation, the value of such compensation and the consideration given or performed in exchange for such compensation."

With regard to section 18, the trial judge reasoned that compliance was impossible, or, at the least, unduly burdensome. He also reasoned that section 18 was overly broad, and bore no relationship to the legitimate purposes of the act. Hence, the trial court held that section 18 unconstitutionally infringed upon the right to petition. The trial court found no errors of constitutional dimension in the provisions of sections 15 and 17.

The First Amendment right of the people to "petition the government for a redress of grievances" is one of the cornerstones of our constitutional democracy. Since its ancestral beginnings as an obscure provision in the Magna Carta, the right to petition has been commonly understood to be a procedure of an open and public nature. The history of England includes picturesque exercises of this right including a Chartist petition in 1842 six miles in length which had to be broken into bundles before it could be presented to the House of Commons. The right to petition was incorporated into many of the legislative pronouncements of the rebelling colonies and in the Declaration of Independence. In the 1830's, the Congress was deluged with petitions calling for the abolition of slavery. In response, the House adopted a standing rule that all petitions of this nature would be tabled without public notice, or action of any kind. John Quincy Adams vehemently fought and won repeal of the rule maintaining that not even "the most abject despotism" would "deprive the citizen of the right to supplicate for a boon, or to pray for mercy." Other notable examples of open and well publicized petitioning in the history of the United States include: the deployment of unemployed armies of petitioners by General Coxey of Ohio in 1894, the march for bonuses by veterans in 1932, and the dramatic marches of the poor led by Dr. King and Reverend Abernathy in the past decade. We note these examples to emphasize the intrinsically nonsecretive and public nature of the historic development of the right to petition. 11 *Encyclopaedia of the Social Sciences* 98-101 (E. Seligman ed. 1937).

■ That right to petition, of course, is not limited to mass demonstrations, highly publicized in newspaper headlines and in television news reports. In sharp contrast, lobbying can be a far more subtle, unpublicized, and we surmise a more effective method of petitioning the government. The profound effect that lobbying may have upon the legislative processes is tacitly recognized in common references to lobbyist activities as the "third house" or the "fifth estate." We take special and emphatic notice of the fact that lobbyists perform important and constructive functions in communicating the wishes of the interests they represent to the appropriate organs of government. In our opinion, the role of the lobbyist in openly and appropriately communicating with government in regard to legislation and other related functions of government is clearly assured and protected by the First Amendment right to petition government.

The purpose and the function of sections 15 and 17 of Initiative 276 are not to restrict or prohibit appropriate and protected communications of the lobbyist. Contrariwise, the effect of these sections of the initiative only requires that one who receives compensation and/or expends funds in lobbying must register and openly and publicly report the nature and extent of his activities in this particular regard. By narrowing its scope to the influence of money upon governmental processes, Initiative 276 avoids unconstitutional restrictions upon the ambit of the guarantees of the First Amendment.

Consistent with the intendment of the initiative to avoid possible encroachment upon the right to petition, section 16, RCW 42.17.160, excludes from coverage: (1) any person who simply appears in a *public session* of a legislative committee or the hearings of public agencies; (2) the press; and (3) one who lobbies without compensation and without making expenditures on behalf of public officeholders. Thus, in this especial and additional manner, the initiative seeks to avoid impingement upon First Amendment guar-

antees, but requires and implements the disclosure óf information which may aid the receiver *and the general public* in evaluating the influence of money upon legislative decision-making and related functions of government.

Discussion of the compensatory and pecuniary aspects of the lobbying profession may be severed from its protected communication aspects as stated by the United States Court of Appeals for the First Circuit,

> The First Amendment does not provide the same degree of protection to purely commercial activity that it does to attempts at political persuasion. . . . Moreover, the First Amendment does not prevent government from adopting reasonable rules for regulating the conduct of those who seek its favor.

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25, 33 (1st Cir. 1970). Hence, where one is engaged professionally and for compensation to persuade or influence the decisions of others as to matters affected with a public interest, he may be subject to extensive disclosure requirements. As an example, an attorney engaging in "persuader" activities, as defined by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 401 *et seq.*, must report not only receipts and disbursements regarding the business of the persuader's clients, but also his receipts and related disbursements for all labor related services. *Price v. Wirtz,* 412 F.2d 647 (5th Cir. 1969). The pecuniary feature of magazine sales brought that activity within the regulatory power of the state in *Breard v. Alexandria,* 341 U.S. 622, 642, 95 L. Ed. 1233, 71 S. Ct. 920, 35 A.L.R.2d 335 (1951), wherein the United States Supreme Court stated,

> We agree that the fact that periodicals are sold does not put them beyond the protection of the First Amendment. The selling, however, brings into the transaction a commercial feature.
>
> The First and Fourteenth Amendments have never been treated as absolutes. Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. Rights other than those of

the advocates are involved. By adjustment of rights, we can have both full liberty of expression and an orderly life.

(Footnotes omitted.)

In *State v. Conifer Enterprises,* 82 Wn.2d 94, 100, 508 P.2d 149 (1973), we upheld a statute prohibiting the paid solicitation of initiative signatures, saying:

Clearly, the solicitation of signatures for an initiative petition is political expression falling within the ambit of the freedom of speech guaranteed by the First Amendment. But RCW 29.79.490(4) does not make it unlawful for respondents to solicit signatures on an initiative petition. Nor does it forbid others from doing likewise at respondents' request. The statute only makes it unlawful for the respondents to *pay* (or offer to pay) other persons to solicit signatures. This narrow proscription does not abridge respondents' freedom of speech since such payment bears no necessary relationship to their exercise of that right.

The United States Supreme Court firmly established the power of the government to require registration and reporting of lobbyists' activities in the landmark decision of *United States v. Harriss,* 347 U.S. 612, 625, 98 L. Ed. 989, 74 S. Ct. 808 (1954). In *Harriss,* which involved a *criminal* prosecution for failure to register and report under the Federal Regulation of Lobbying Act, the court recognized that:

Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence

legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much.

(Footnote omitted.) The aim of the *civil* provisions of Initiative 276 is no different. *Cf. United States v. Rumely,* 345 U.S. 41, 97 L. Ed. 770, 73 S. Ct. 543 (1953). *See generally* Fleishman, *Freedom of Speech and Equality of Political Opportunity: The Constitutionality of the Federal Election Campaign Act of 1971,* 51 N.C.L. Rev. 389 (1973); Comment, *Public Disclosure of Lobbyists' Activities,* 38 Fordham L. Rev. 524 (1970).

Initiative 276, as we have noted, was created by the people for the expressed purpose of fostering openness in their government. To effectuate this goal, it is important that disclosure be made of the interests that seek to influence governmental decision making. Thus, the requirements of registration under section 15 and reporting under sections 17 and 18 are designed to exhibit in the public forum the identities and pecuniary involvements of those individuals and organizations that expend funds to influence government.

Informed as to the identity of the principal of a lobbyist, the members of the legislature, other public officials and also the public may more accurately evaluate the pressures to which public officials are subjected. Forewarned of the principals behind proposed legislation, the legislator and others may appropriately evaluate the "sales pitch" of some lobbyists who claim to espouse the public weal, but, in reality, represent purely private or special interests.

The electorate, we believe, has the right to know of the sources and magnitude of financial and persuasional influences upon government. The voting public should be able to evaluate the performance of their elected officials in terms of representation of the electors' interest in contradistinction to those interests represented by lobbyists. Public information and the disclosure required by section 24, *supra,* coupled with that required of lobbyists and their

employers may provide the electorate with a heretofore unavailable perspective regarding the role that money and financial influence play in government decision making and other functions performed by public officials. Actually, the mosaic of Initiative 276 is designed to reveal the flow of expenditures incurred in efforts to guide and direct government. The removal of any one element would conceivably leave a loophole area for exploitation by self-serving special interests. Section 18 concerns the reporting of monies paid directly or indirectly to candidates and to public officials. This provision inhibits the flow of secret money from an inappropriate special interest source to legislators or other government officials for inappropriate special interest purposes. Hence, there is a rational nexus between a legitimate societal purpose of the electorate and the requirements of section 18.

We cannot concur with the finding of the trial court that compliance with section 18 is impossible. We can agree that the requisite collation of expenditures with the names of public officials may be somewhat voluminous, detailed, and burdensome. It would seem that in most instances the degree of difficulty would escalate in relation to the size of a particular legislative lobbying program. We note that the appellants have made no attempt to apply for a waiver under the hardship provisions of section 37(9), RCW 42.17.370(9). The burden of collation is eased to some degree by the compilation of a list of public officials kept current by the Public Disclosure Commission. WAC 390-04-080, -090. Further, under its power to implement the provisions of the act, the regulations of the commission have provided that an omission in reporting the name of a public official will be deemed presumptively due to an unreasonable hardship. WAC 390-04-100. In our opinion, promulgation of such regulations would seem to be within the commission's delegated authority. *Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 500 P.2d 540 (1972). Since appellant Washington Food Processors Council has made no effort to exhaust its administrative reme-

dies, we are not impressed by its efforts to circumvent those procedures here. *State ex rel. Association of Wash. Indus. v. Johnson,* 56 Wn.2d 407, 353 P.2d 881 (1960). We are convinced the decision of the trial court should be affirmed as to initiative sections 15 and 17 and reversed as to section 18.

INITIATIVE SECTION 40 (4)—CITIZEN SUITS

Section 40(4), RCW 42.17.400(4) of Initiative 276 provides as follows:

Sec. 40. ENFORCEMENT. . . .

. . .

(4) Any person who has notified the attorney general in writing that there is reason to believe that some provision of this act is being or has been violated may himself bring in the name of the state any of the actions (hereinafter referred to as a citizen's action) authorized under this act if the attorney general has failed to commence an action hereunder within forty days after such notice and if the attorney general has failed to commence an action within ten days after a notice in writing delivered to the attorney general advising him that a citizen's action will be brought if the attorney general does not bring an action if the person who brings the citizen's action prevails, he shall be entitled to one-half of any judgment awarded, and to the extent the costs and attorney's fees he has incurred exceed his share of the judgment, he shall be entitled to be reimbursed for such costs and fees by the State of Washington: PROVIDED, that in the case of a citizen's action which is dismissed and which the court also finds was brought without reasonable cause, the court may order the person commencing the action to pay all costs of trial and reasonable attorney's fees incurred by the defendant.

The trial court's reasoning was that section 40(4) exposes potential defendants to abusive or capricious prosecution. Largely on this basis the trial court concluded that section 40(4) deprives appellants of due process and is therefore unconstitutional.[5]

---

[5]The consolidated trial of Simmons and Fritz apparently has resulted in some initial confusion. The issues relating to section 40(4)

Section 40 (4) of the initiative is merely a codification of the ancient common-law *"qui tam"* procedure or doctrine. Essentially a qui tam action is brought by an "informer" or volunteer for violation of a particular civil or criminal statute which generally provides that the informer, if successful, may recover his costs and attorney fees, as well as a share of the penalty. It is called a *"qui tam* action" because the plaintiff states that he sues for the state *as well as himself.* Black's Law Dictionary 1414 (rev. 4th ed. 1968).

The constitutionality of the qui tam action was resolutely upheld by the United States Supreme Court in *Marvin v. Trout,* 199 U.S. 212, 225, 50 L. Ed. 157, 26 S. Ct. 31 (1905), wherein an Ohio anti-gambling measure authorizing a qui

were discussed tangentially in the Simmons briefs. We address this issue in the context of the Fritz case where it was raised.

While the appellants acknowledge that no citizen suit has been lodged against them, they assert, however, that the threat of frivolous and harassing actions filed under section 40(4) exerts a "chilling effect" upon their First Amendment right to petition. *NAACP v. Button,* 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). Such alleged infringement upon the free exercise of First Amendment rights clearly places this issue squarely before the court.

In addition, we note the broad scope of review which results as a concomitant of an action for declaratory judgment. As stated in *Department of Game v. Puyallup Tribe, Inc.,* 80 Wn.2d 561, 576, 497 P.2d 171 (1972), *rev'd on other grounds,* 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973):

> We must remember that this case was instituted under the declaratory judgment act, seeking guidelines for the adoption of continuing regulations, if any. *It is therefore proper that all issues raised in this case be considered.*

(Italics ours.)

Our breadth of review was also noted in *State ex rel. Distilled Spirits Institute, Inc. v. Kinnear,* 80 Wn.2d 175, 178, 492 P.2d 1012 (1972):

> Where the question is one of great public interest and has been brought to the court's attention in the action where it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to the other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation.

In Fritz the issue regarding section 40 (4) is clearly of this nature.

tam action was squarely presented. With regard to who might bring an action under the statute, the court stated:

> *Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy* other than that given by statute, *have been in existence for hundreds of years* in England, and in this country ever since the foundation of our Government. *The right to recover* the penalty or forfeiture *granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever* except as such informer.

(Italics ours.)

A later Supreme Court case involving a federal statute under which electrical contractors had been charged with collusive bidding on government projects was *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 87 L. Ed. 443, 63 S. Ct. 379 (1942). *Hess* strongly reaffirmed the *Marvin v. Trout* holding, and Justice Black chided the circuit court for its mistaken and limiting interpretation of the qui tam action. *See also United States v. Anaconda Wire & Cable Co.*, 342 F. Supp. 1116 (S.D.N.Y. 1972).

The statute books are legion with enactments of a qui tam nature. *See, e.g.,* Int. Rev. Code of 1954 § 7214; Rivers and Harbours Act of 1889, 33 U.S.C. § 411 (1970); Clean Air Amendments of 1970, *amending* 42 U.S.C. § 1857h-a (1970); Federal Water Pollution Control Act Amendments of 1972 § 505, Pub. L. 92-500, 86 Stat. 816; Noise Control Act of 1972 § 12, Pub. L. 92-574, 86 Stat. 1234. Our recent decision in *Hockley v. Hargitt*, 82 Wn.2d 337, 510 P.2d 1123 (1973), upheld the application of a modern qui tam provision in the Washington Consumer Protection Act, RCW 19.86.090, which provides for the award of attorney fees, costs and, in the discretion of the court, treble damages. *See also* Note, 17 Loyola L. Rev. 757 (1971).[6]

---

[6]The recovery of damages in a suit by a citizen under section 40(4) is against a private individual defendant, not against the state or any subdivision thereof, and thus does not involve any disbursement of public funds. The payment of such damages is pursuant to a judgment of the superior court in the same context as the recovery and payment

█ In our view, the qui tam provision of initiative section 40(4) poses no problem of constitutional dimension. We note respondents' assertion that they fear the threat of frivolous and unwarranted harassment suits. In this connection we can also note that should the suitor fail in his action the trial court, upon finding lack of reasonable cause, may reimburse the defendant for his costs and attorney's fees. In view of the current high costs of legal services, we regard this as no small deterrent against frivolous and harassing suits. Additionally, the plaintiff in such cases is required to give the Attorney General a 40-day notice of an alleged violation. The litigant may then proceed *only after the service of a second 10-day notice* results in no action on the part of the Attorney General.

We feel that these specified safeguards are ample protection against frivolous and abusive lawsuits. Should, however, the courts experience a significant number of palpably frivolous lawsuits, this court may not be without the tools to fashion a remedy within its rule-making powers. *Cf.* CR 65(c) (security required as a prerequisite to the issuance of a restraining order or temporary injunction); RCW 23A.08.460 (bond for costs required by minority shareholders in derivative actions). We think the trial court's judgment in regard to section 40(4) of the initiative should be reversed.

### Attorney Fees

The appellants in Fritz, and the respondent public officials, as well as intervenor—Ms. Norton in Simmons, assert and claim that they are entitled to an award of attorney's fees.

It is contended that this litigation has conferred a particular benefit upon the people of Washington, and therefore, the claimants should be awarded attorney fees for rendering a public service. This assertion and claim appears to us to be rather debatable. Ostensibly, appellants in Fritz and

of damages in any litigation. No public funds or misappropriation or misapplication thereof is involved in 40(4) litigation. It seems obvious that article 8, section 4 of the Washington Constitution is inapplicable.

the respondents in Simmons are representing their own private interests, and in addition they have not prevailed on appeal.

■ It is well established that attorney fees will not be granted unless they are specifically authorized by statute, and funds are appropriated and available. *Rocky Mountain Fire & Cas. Co. v. Rose,* 62 Wn.2d 896, 385 P.2d 45. 1 A.L.R. 3d 876 (1963); *Schoenwald v. Diamond K Packing Co.,* 192 Wash. 409, 73 P.2d 748 (1937). Neither our research nor that of claimants has produced convincing authority to support granting of attorney fees requested in these companion cases. We have no alternative but to deny the claims for awards of attorney fees.

For the reasons indicated, the trial court should be reversed as to sections 18 and 40(4) of Initiative Measure No. 276, but otherwise affirmed. It is so ordered.

HALE, C.J., and HAMILTON and WRIGHT, JJ., concur.

STAFFORD, UTTER, and BRACHTENBACH, JJ.—We concur except to the extent noted in our separate opinion and concur in the result reached by the majority as to section 40(4) of Initiative 276.

WRIGHT, J.(concurring)—I concur in the majority opinion and have signed the same. I wish to add this brief concurrence in order to point out that amendment 26 is not relevant to the applicability of article 2, section 19 to initiative measures. Amendment 26, also known as article 2, section 41, contains the words "[n]o act, law, *or* bill" (italics mine). The wording is in the disjunctive. Amendment 26 is directed to referendum as well as initiative measures. A referendum measure having its origin in the legislature may properly be referred to as a "bill," and, therefore, amendment 26 can in no wise be viewed as modifying the rule of *Senior Citizens League v. Department of Social Security,* 38 Wn.2d 142, 228 P.2d 478 (1951).

UTTER, J. (concurring)—I concur with the majority opinion. My only concern is with the holding that article 2,

section 19 of the state constitution applies only to legislative "bills." Although this is a holding in *Senior Citizens League v. Department of Social Security,* 38 Wn.2d 142, 228 P.2d 478 (1951), the dissent's criticism of that case is persuasive, and I would hold that article 2, section 19 applies to initiatives. To that extent I would overrule the foregoing case.

I believe the majority, however, correctly finds the subject matter of the initiative has a rational unity and that the subject of the initiative is sufficiently expressed in its title. For these reasons, the initiative does not violate article 2, section 19.

Stafford and Brachtenbach, JJ., concur with Utter, J.

Hamilton, J.—I have signed the majority opinion with the reservation noted in Justice Utter's concurrence, with which I agree.

Hale, C.J. (concurring in part; dissenting in part)—I concur in and have signed the majority opinion and dissent only to that part of it which sustains section 40 (4), (Laws of 1973, ch. 1, § 40 (4) p. 28) which I think is unconstitutional and invalid. Section 40 (4), in purporting to authorize any person to maintain an action in the name of the state against any elected official, candidate or lobbyist and to share in the penalties recovered does not, in my opinion, fall within the recognized limitations of the qui tam doctrine, but, on the contrary, grossly exceeds them. Accordingly, while holding the initiative generally constitutional, I would affirm the trial court's decision that section 40 (4) is unconstitutional.

Section 40 (4) grants to persons, neither appointed nor elected, virtually unlimited powers not elsewhere vested in the disclosure commission, the Attorney General or the prosecuting attorneys of the state. For example, it is doubtful whether, under the act, the commission may directly maintain court actions for the enforcement of the act, either in its own name or that of the State of Washington

in view of section 36 (5) which empowers the commission only "Upon complaint or upon its own motion, [to] investigate and report apparent violations of this act to the appropriate law enforcement authorities." The commission's powers appear to be limited by section 36 (7) directing that the commission shall "Enforce this act according to the powers granted it by law." Ultimate enforcement of the enactment is entrusted to actions by the commission, the Attorney General, or any of the several prosecuting attorneys of the state. This is so except for section 40 (4) which presumably without restraint fixes a major power of enforcement in any person who wishes to do so and assures a pecuniary reward if the action is successful. The powers thus conferred to share in the public treasury under a claim of enforcing the statute now vested in "any person" far exceed those of the public officials charged by law with its enforcement—the right to a share of the penalties collected. All that section 40 (4) requires of "any person" who may bring suit against any candidate, elected official, or lobbyist is that he first give notice of a simple belief that the initiative is being or has been violated.

The section goes far beyond the limitations generally applicable to qui tam actions. It is not limited to those who claim some special damage or disability by reason of a violation; nor as a reward for services performed to the state as an informer, or in capturing a criminal; nor for services rendered the state in preserving its domain—all in advance of and as a necessary predicate to maintaining the action. Rather, it exceeds the recognizable limitations of qui tam by purporting to grant to private persons who, aside from bringing the action, have rendered no service whatever to the state, entered into no contract with the state, nor unilaterally performed a contract with it.

Thus, "any person" harboring or merely asserting to harbor such a belief may, in the name of the State of Washington, bring suit against any or all public officials wheresoever they may be situate, and from whatsoever motive—

whether lofty or low, for high purpose or self-gain, from malice, ill will or political advancement—even to a demand that the award in which he will share shall be trebled as punitive damages (section 40(5)), subject only to the rather nebulous limitation that he might be required to pay costs and a reasonable attorney's fee if the defendant prevails.

In case of an insolvent plaintiff, this restriction amounts to little or no restriction whatever, and lays open all public officials, candidates and lobbyists to the unlimited burdens of defending both in money and time in unlimited litigation. Section 40(4) thus, to the detriment of the constitutional executive powers vested in the Attorney General, the prosecuting attorneys, and the disclosure commission, and in trespass of those powers, transfers a substantial quantum of the executive power from elective and lawfully appointed officers to "any person" who chooses to exercise them—and gives such person a share in the state treasury to boot.

Section 40(4) of the initiative is unconstitutional, therefore, because the powers accorded to "any person" in this state are so sweeping and unrestrained as to vest major powers of government in individuals in derogation of the executive power vested by the constitution in officials elected by the people.

Section 40(4) says:

> Any person who has notified the attorney general in writing that there is reason to believe that some provision of this act is being or has been violated may himself bring in the name of the state any of the actions (hereinafter referred to as a citizen's action) authorized under this act if the attorney general has failed to commence an action hereunder within forty days after such notice and if the attorney general has failed to commence an action within ten days after a notice in writing delivered to the attorney general advising him that a citizen's action will be brought if the attorney general does not bring an action if the person who brings the citizen's action prevails, he shall be entitled to one-half of any judgment

awarded, and to the extent the costs and attorney's fees he has incurred exceed his share of the judgment, he shall be entitled to be reimbursed for such costs and fees by the State of Washington: PROVIDED, that in the case of a citizen's action which is dismissed and which the court also finds was brought without reasonable cause, the court may order the person commencing the action to pay all costs of trial and reasonable attorney's fees incurred by the defendant.

Thus, the section allows "any person" to share in the penalties collectible by the sovereign State of Washington for violations of the initiative as prescribed by section 39 (1) (c) which subjects "Any person who violates any of the provisions of this act . . . to a civil penalty of not more than ten thousand dollars for each such violation" and 39 (1) (d) which renders liable "Any person who fails to file a properly completed statement or report within the time required by this act . . . to a civil penalty of ten dollars per day for each day each such delinquency continues."

In construing section 40, the first question which arises is whether the powers it purports to accord the Attorney General and the prosecuting attorneys of the state are similarly vested in any person maintaining the private action in the name of the state under section 40 (4). Section 40 (2) purports to give the Attorney General of the state and the prosecuting authorities of the political subdivisions of the state powers not yet accorded those officials elsewhere, i.e., the powers to summon individuals before them and order them to answer under oath. The initiative thus says that the Attorney General and prosecuting attorneys may require persons reasonably believed to have information concerning the activities of any individuals covered by the act to appear at a designated time and place and to give information under oath and "to produce all accounts, bills, receipts, books, papers, and documents which may be relevant or material to any investigation authorized under this act." Section 40 (3) says that the Attorney General and the prosecuting authorities of any of the state's political subdivisions may do this merely by issuing and delivering an

order "setting forth the time when and the place where attendance is required," and that "[s]uch order shall have the same force and effect as a subpoena, shall be effective state-wide, and . . . may be enforced by any superior court judge in the county where the person receiving it resides . . . in the same manner as though the order were a subpoena." Powers heretofore thought to rest only in the judiciary, *i.e.*, the power to compel one to submit to examination under oath, is thus sought to be vested in the prosecuting attorneys and the Attorney General of the state.

Does this mean, in section 40 (4), that "Any person who has notified the attorney general" that he believes the act is being violated succeeds to the purported powers conferred upon the Attorney General and the prosecuting attorneys of the state when the Attorney General declines to maintain the action officially? If given a fair interpretation, the act is susceptible of such a construction; it purports to clothe any individual in the state who may choose to exercise them, with powers not only of an attorney general or prosecuting attorney but with those of a judge or a duly constituted grand jury. Although the power to compel the testimony under oath has not in this state thus far been vested by law in the Attorney General or the prosecuting attorneys but has been thought limited by the constitution to the courts and judicial officers, the initiative measure before us apparently purports to grant those very powers to private citizens.

Section 40 (4), I think, not only seeks to transfer a major judicial power to the executive branch but goes one degree further and seeks to vest it in individuals not elected by the people, that is, any person who wishes to maintain an action for his private benefit.

In establishing and perpetuating the government of the State of Washington, the people expressly reserved to themselves the power to elect their major public officers, including the judiciary, the Attorney General and the pros-

ecuting attorneys. They have set up and have steadfastly maintained a system of government based on free elections. While the duties and powers of elective officials whose offices have been established by the constitution may be prescribed by the legislature or by the people through the initiative and referendum, it follows that their major functions cannot be destroyed or usurped by or transferred to nonelective offices or individuals short of amending the constitution.

The Attorney General and the prosecuting attorneys of the several counties who may have been granted extraordinary powers under section 40 of the act hold executive offices created by the constitution. They must be elected by the people. Const. art. 3, § 1, establishing the executive branch of government, states:

> The executive department shall consist of a governor, lieutenant governor, secretary of state, treasurer, auditor, *attorney general*, superintendent of public instruction, and a commissioner of public lands, who shall be severally chosen by the qualified electors of the state at the same time and place of voting as for the members of the legislature.

(Italics mine.)

Section 21 of article 3 provides, *inter alia*:

> The attorney general shall be the legal adviser of the state officers, and shall perform such other duties as may be prescribed by law.

It thus follows that the Attorney General must be elected by the people and, as the legal adviser of state officers, his powers cannot constitutionally be circumvented nor abridged by the establishment of other offices with purported powers to assume his duties, responsibilities and authority.

The same principle applies to the prosecuting attorneys of the several counties. Const. art. 11, § 5, reads:

> The legislature, by general and uniform laws, shall provide for the election in the several counties of . . . prosecuting attorneys . . . And [the legislature]

shall provide for the strict accountability of such officers for all fees which may be collected by them and for all public moneys which may be paid to them, or officially come into their possession.

The duties of the prosecuting attorney have been prescribed by statute. RCW 36.27.020. They have been legislatively enlarged from time to time. Among his many duties, a prosecuting attorney is expressly required to prosecute all criminal and civil actions in which the state or his county may be a party, defend all suits brought against the state in his county, and prosecute actions "for the recovery of debts, fines, penalties, and forfeitures accruing to the state or his county." RCW 36.27.020 (4). He is expressly authorized to attend, appear before, give advice to the grand jury "and draw all indictments when required by the grand jury." RCW 36.27.020 (5). No part of the fines, penalties, or forfeitures can inure to his private benefit. *See* Const. art. 11, § 5 and Const. art. 3, § 21, and *State ex rel. Stratton v. Maynard,* 35 Wash. 168, 76 P. 937 (1904). If he intends to subject another to compulsory examination under oath he must summon him before a grand jury or before a special inquiry judge. RCW 10.27.

*I would doubt that the legislature or the people by initiative may accord to nonelective officials or private persons either the power to recover debts, fines, penalties or forfeitures accruing to the state or county or the power to take charge of a grand jury, much less the right to share in the debts, fines, penalties and forfeitures so collected in the name of the state.*

Accordingly, insofar as section 40 (4) ousts the prosecuting attorneys and the Attorney General of their constitutionally held powers and authority, and transfers a substantial quantum of such powers to any person who has "reason to believe that some provision of this act is being or has been violated," it is an unconstitutional and invalid exercise of legislative power. The section (40 (4)) not only gives such private person "one-half of any judgment

awarded" but "to the extent the costs and attorney's fees he has incurred exceed his share of the judgment, he shall be entitled to be reimbursed for such costs and fees by the State of Washington." In purporting to enable any such person, merely upon his claim or assertion that he harbors a belief that someone has violated the initiative, to sue on behalf of the State of Washington for his private gain to recover such civil penalties as may be awarded, the initiative contravenes the constitutional provision that those who exercise the power of the executive branch must be elected by the people or lawfully appointed by their constitutional offices. That this section trespasses upon the right of the people to elect their Attorney General and the prosecuting attorneys is apparent from cases decided by this court: In *State ex rel. Hamilton v. Troy,* 190 Wash. 483, 486, 68 P.2d 413, 110 A.L.R. 1211 (1937), the legislature, through an enactment of Laws of 1937, chapter 100, p. 406, sought to change the official title of the office of prosecuting attorney to district attorney. In holding this statute unconstitutional and void, this court said:

> The matter before us appears trifling at first sight, and is, in fact, of slight importance, in so far as direct consequences are concerned. But, as suggested by the relator, if the legislature has the power to change the name of one constitutional office, it has the power to change the name of any and all. The matter would appear of greater consequence if, for example, instead of the act under consideration, we had before us an act changing the title of governor to dictator or czar. But, wholly aside from these practical considerations, there is a principle involved of first importance. There is a constitutional inhibition, and, although it arises by implication, it is fully as compelling as it would be if directly expressed.

As a basis for holding the act unconstitutional, this court there cited Const. art. 11, § 5, which prescribed, *inter alia,* that the office of prosecuting attorney shall be an elective office. Acknowledging that the prosecuting attorneys of the state earnestly desired the proposed change of name, this court said:

> [I]t is plainly our duty to hold that the legislature, act-

ing alone, had no power to make it, and that the [statute was] inoperative and of no effect.

Changing the name of the office of prosecuting attorney to district attorney, we held constituted an amendment and that, under article 23 of the state constitution, the constitution "can only be amended by a two-thirds vote of both branches of the legislature, subsequently followed and confirmed by a vote of the people." *State ex rel. Hamilton,* at page 487. We therefore declared the statute invalid. This rationale, of course, applies with equal force to initiatives as well as to statutes enacted by the legislature.

The second case is even more persuasive. *State ex rel. Johnston v. Melton,* 192 Wash. 379, 73 P.2d 1334 (1937), involved a challenge to section 4 of the same statute (Laws of 1937, chapter 100, § 4, p. 406) that was challenged in *State ex rel. Hamilton v. Troy, supra.* The law purportedly authorized the district attorney to appoint as many investigators as would be necessary to administer the affairs of the office of district attorney and to enforce the law. Section 4 of the statute gave these investigators the same authority as the county sheriff to make arrests anywhere in the county and to serve warrants, writs, subpoenas and all other criminal process. It provided explicitly that such investigators "shall not be under the authority and direction of the sheriff, and shall only be under the authority and direction of the said District Attorney."

Again citing Const. art. 11, § 5, because it provided for the election of county sheriffs as well as for prosecuting attorneys, this court held the act authorizing such powers in the district attorney's investigators to be unconstitutional and void. We referred to *State ex rel. Egbert v. Blumberg,* 46 Wash. 270, 89 P. 708 (1907), in *State ex rel. Johnston v. Melton, supra* at 383, saying:

It was held in that case that § 4, chapter 133, Laws of 1903, p. 247, attempted to create the office of county fruit inspector and was unconstitutional and void, because it provided that the office should be filled by appointment instead of by election.

We pointed out, too, in *State ex rel. Johnston v. Melton, supra,* that the statute in question purported to accord to the district attorney's investigators powers to make arrests which even the prosecuting attorneys did not themselves possess, and that in creating the office of investigator, the statute purported to give them powers independent of both the prosecuting attorney and the sheriff. We said, at page 385:

Furthermore, the powers thus granted are powers which the people of the state expressly provided in the constitution should be executed only by persons elected by themselves. The people are the source of all governmental power, and, in setting up a constitutional government, they provided that certain of their powers should be exercised through county governments, governments close to the people; and they further provided, in § 5 of Art. 11 of the constitution, that the powers to be thus exercised through county governments should be exercised only through officials elected by themselves. In § 5 of Art. 11, they named the officers whom they then thought needful, county commissioners, sheriffs, county clerks, treasurers, prosecuting attorneys, and, being mindful that this is a world of continual development and change, they provided that the legislature might create other county offices as public convenience might require. In 1924, moved by reasons of economy, they provided, by the twelfth amendment, that, in certain classes of counties, one person might exercise the power and perform the duties of two or more offices; but these persons, as well as the incumbents of newly created offices, are as rigidly subject to election as the officers originally named in the constitution.

The marked similarity between that statute and section 40 (4) under inquiry should not go unobserved for where that statute gave to the investigators authority which the prosecuting attorneys did not possess, and powers independent of those of the elective sheriff, too, section 40 (4) likewise gives private citizens powers not possessed by either the elected Attorney General or elected prosecuting attorneys, *i.e.,* the power to collect and receive public penalties and civil fines.

This court clearly, in that opinion, as I would here, based its ruling of unconstitutionality not only upon the creation of a nonelective office by statute, with power to usurp the functions of elected officials, but also on the ground that the statute breached the separation of powers doctrine, a doctrine upon which our whole constitutional system of government rests. We said, at page 392:

> But the argument has more in it than that. James Madison said, in the 47th number of The Federalist:
> "The accumulation of all powers, legislative, executive, and judicial, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."
> To keep these powers as separate as humanly possible was the studied effort and dominant purpose of the framers of each and every one of our American constitutions, both state and Federal. This court has said, in *In re Bruen*, 102 Wash. 472, 172 Pac. 1152, that the courts have ever been alert and resolute to keep the legislative, executive, and judicial functions carefully separated, and that to this is due the steady equilibrium of our governmental system; and, while we might not declare § 4 of the act unconstitutional for this reason alone, it is one of the reasons which impels us to do so.

One may search all aspects of section 40(4) and find no limitations whatever upon the powers of the private citizen to sue or maintain an action against any candidate, public official, or lobbyist. All that is required is that the plaintiff serve upon the Attorney General a notice that there is reason to believe any one or all of the prospective targets are violating or have violated the initiative and that the plaintiff intends to bring an action for himself and for the state 10 days after the expiration of the 40-day period within which the Attorney General may initiate suit, for the purpose of recovering one-half of any judgment which the state in a proper case could recover. This claim, of course, may include a demand for treble damages under section 40(5) upon a finding that the alleged violation was intentional. However groundless the private citizen's asser-

tions of the violations may be, section 40(4) requires no more of a predicate for his private action than that the Attorney General decline to bring the action. Should the Attorney General decline to bring the action because it appears either groundless or frivolous or inspired by personal animus or is purely political, the private citizen under section 40(4) succeeds to the powers of Attorney General. And, in addition, the private citizen will acquire a larger right in the lawsuit than does either the public prosecutor or the Attorney General because he will obtain one-half of all of the sums which, if recovered by the Attorney General or the prosecuting attorney, would as a matter of law inure to the treasury of the State of Washington.

The point made in *State ex rel. Johnston v. Melton, supra,* that the courts must zealously guard and keep separate the powers of government should be kept in mind here. Section 40(4), authorizing the private collection of money for the violation of a public law, in my opinion, thus presumes to authorize not only a trespass upon the judicial power and the power of grand jurors to conduct inquiries under oath, but invests in private citizens the powers of the publicly elected prosecuting attorneys and Attorney General.

The initiative thus in section 40(4) takes a complete stranger to its purposes and empowers him to act for and on behalf of the state and all of its citizens not only to enforce the penal provisions of a civil statute but for private pecuniary benefit. In addition to the Attorney General, the prosecuting attorneys of the several counties, the Public Disclosure Commission, the grand juries and special inquiry judges charged by law with the duty of enforcing the initiative, section 40(4) purports to empower private persons to act at their private whim whether for malice, private gain, or for purely political reasons on behalf of the state and in its name. It clothes the plaintiffs with powers of government reserved by the constitutions to the elective executive and judicial branches of government. I do not

think that the qui tam doctrine as delineated in the majority opinion or elsewhere should be permitted to override and nullify the separation of the powers of government so explicitly delineated in the state constitution.

Although the state has an interest in the enforcement of this initiative as it has in enforcing all laws, that interest does not warrant reposing unconstitutional powers in private citizens. It could as readily be said that the state has the same interest in recovering judgments for breach of contract or for tortious damage to its property, but it is quite unlikely that it could constitutionally oust its constitutional officers of their powers by authorizing private citizens to maintain private actions in the name of the state for private gain solely for the purpose of protecting the state's interests. The people in their constitution have already established public offices to assert and sustain the state's interests and except by amending the constitution these powers cannot be constitutionally transferred to private citizens.

In short, section 40 (4) without limit purports to clothe innumerable private citizens acting solely upon their own volition or motivated by whim, caprice or malice to a share in the executive powers of government, that is to say, the power to sue in the name of the state for the recovery of pecuniary penalty which, by law, and of right, ought to be recovered into the state treasury. Section 40 (4) gives private citizens a carte blanche authority and delivers into the hands of persons neither lawfully elected nor appointed the sovereign executive powers of the state to sue in its own name for the benefit of all of the citizens.

Section 40 (4) is and should be held unconstitutional and void.

HUNTER, J.—I concur in the dissent only of this opinion.

ROSELLINI, J.—I concur that section 40 (4) is unconstitutional.

ROSELLINI, J. (dissenting)—I dissent. The majority relies

on *Senior Citizens League v. Department of Social Security*, 38 Wn.2d 142, 228 P.2d 478 (1951), as authority that Const. art. 2, § 19, providing that no bill shall embrace more than one subject and that shall be expressed in the title, does not apply to initiative measures. This holding came at the conclusion of a 29-page decision dealing with 23 other holdings, without discussing or considering Const. art. 2, § 1, which provides, in part:

[T]he people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature . . .

It did not discuss Const. art. 2, § 19, which was included in the Washington State Constitution when it was first adopted in 1889 and predates amendment 7, which adopted article 2, section 1, in its present form in November 1912. Thus, the legislature, in proposing the amendment to the people and the people in enacting it, must be presumed to have been aware of the existence and applicability of article 2, section 19.

It is an elementary principle of constitutional and statutory construction that provisions on the same subject are to be construed in conjunction with each other. 2A J. Sutherland, *Statutory Construction* § 51.02 (4th ed. C. Sands 1973), states:

In terms of legislative intent, it is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter, wherefore it is held that in the absence of any express repeal or amendment therein, the new provision was enacted in accord with the legislative policy embodied in those prior statutes, and they all should be construed together.

(Footnotes omitted.)

Along these same lines, the court in *Hatzenbuhler v. Harrison*, 49 Wn.2d 691, 697, 306 P.2d 745 (1957), stated:

Another rule of statutory construction which the courts observe is that the law-making body is presumed to be familiar not only with its own prior legislation

relating to the subject of legislation, but also with the court decisions construing such former legislation.

*See also Graffell v. Honeysuckle,* 30 Wn.2d 390, 191 P.2d 858 (1948); *In re Levy,* 23 Wn.2d 607, 161 P.2d 651, 162 A.L.R. 805 (1945). *See also State ex rel. Wolfe v. Parmenter,* 50 Wash. 164, 96 P. 1047 (1908).

A bill is a draft of a law to be enacted by the legislature or by the electors via the initiative process.

It is important to note that amendment 7 was an amendment to article 2 of the constitution which relates to legislative authority. Amendment 7 did not establish a separate special constitutional article relating to initiatives; rather it positioned initiative powers within article 2. Nothing in amendment 7 suggests that the various provisions under article 2 which would normally be applicable to legislation were not to apply to legislation adopted by the initiative process. In fact, the reverse should be assumed.

The validity of the holding is further questionable when the initiative provision of our constitution was amended a year later in 1952. Constitutional amendment 26 provides that

[n]o *act, law, or bill approved by a majority* of the electors voting thereon shall be amended or repealed by the legislature within a period of two years following such enactment . . .

(Italics mine.)

I would reverse the dicta in *Senior Citizens League v. Department of Social Security, supra,* inasmuch as it holds that article 2, section 19, does not apply to initiatives.

In any event, our case law is contra and the majority of other states which have a similar provision to article 2, section 19, have held that it applies to initiative process. Forty-one other states have such provisions and of the seven states where the question of applicability of the provision to initiatives has been raised, only once has the provision been held inapplicable to initiatives.

The California Supreme Court, in *Wallace v. Zinman,* 200

Cal. 585, 591-92, 254 P. 946, 62 A.L.R. 1341 (1927) (cited with approval in *State ex rel. Seymour v. Superior Court,* 168 Wash. 361, 12 P.2d 394 (1932)), stated:

There can be no just reason assigned for holding that this provision [similar to article 2, section 19] is mandatory when applied to statutes passed regularly by the legislature and at the same time inapplicable to statutes initiated by petition and passed by direct vote of the people.

In the case of *Fargo v. Sathre,* 76 N.D. 341, 36 N.W.2d 39 (1949), an initiative to prohibit parking meters on the streets and highways of the state was struck down under the double subject and title provisions of that state.

In the case of *Leininger v. Secretary of State,* 316 Mich. 644, 26 N.W.2d 348 (1947), the court granted a writ of prohibition against the Secretary of State from certifying an initiative for submission to the people regarding fair employment practices, stating the title of the initiative violated the Michigan Constitution of 1908, article 5, section 21, which provided that "no law shall embrace more than one object, which shall be expressed in its title." In the case of *State ex rel. Steen v. Murray,* 144 Mont. 61, 394 P.2d 761 (1964), the court struck down an initiative, saying at page 66:

Even if we were to consider it in separate parts, it would fail because of Article V, § 23, of the Constitution of Montana [single subject provision], because it would contain more than one subject . . .

In our neighboring state of Oregon, in *State ex rel. v. Richardson,* 48 Ore. 309, 319, 85 P. 225 (1906), it was alleged that the title of the initiative was not sufficient. The court held the title sufficient, but clearly held that the constitution's one subject provision was applicable to initiatives. The court's analysis of the initiative process is instructive:

A great number of voters undoubtedly have a superficial knowledge of proposed laws to be voted upon, which is derived from newspaper comments or from conversation with their associates. We think the assertion may safely

be ventured that it is only the few persons who earnestly favor or zealously oppose the passage of a proposed law initiated by petition who have attentively studied its contents and know how it will probably affect their private interests. The greater number of voters do not possess this information and usually derive their knowledge of the contents of a proposed law from an inspection of the title thereof, which is sometimes secured only from the very meager details afforded by a ballot which is examined in an election booth preparatory to exercising the right of suffrage. *It is important, therefore, that the title to laws proposed in the manner indicated should strictly comply with the constitutional requirement.*

(Italics mine.)

Only one state, Arizona, has held otherwise, determining that the single subject limitation does not apply to initiatives without examining the rationale underlying the constitutional requirement. *Iman v. Bolin,* 98 Ariz. 358, 404 P.2d 705 (1965).

Const. art. 2, § 19, provides:

No bill shall embrace more than one subject, and that shall be expressed in the title.

There are two bases for article 2, section 19. First, it is an effort to restrict the scope of legislative proposals so that their contents will be evident to legislators and the public and, secondly, so that neither legislators or the public will be required to support a distasteful measure because it is attached to a meritorious one.

This court has enunciated these purposes on a number of occasions.

The purposes of [article 2, section 19] are threefold: (1) to protect and enlighten the members of the legislature against provisions in bills of which the titles give no intimation; (2) to apprise the people, through such publication of legislative proceedings as is usually made, concerning the subjects of legislation that are being considered; and (3) *to prevent hodge-podge or log-rolling legislation.*

(Italics mine.) *State ex rel. Washington Toll Bridge Authority v. Yelle,* 32 Wn.2d 13, 24, 200 P.2d 467 (1948).

*Accord, YMCA v. State,* 62 Wn.2d 504, 383 P.2d 497 (1963);
*Power, Inc. v. Huntley,* 39 Wn.2d 191, 235 P.2d 173 (1951).

The term "logrolling" was defined in *State v. Waggoner,*
80 Wn.2d 7, 9, 490 P.2d 1308 (1971), as

> the practice of drafting and submitting a bill to the legis-
> lature in such a form that a legislator is required to vote
> for something of which he disapproves in order to obtain
> approval of another unrelated law.

Both policies behind article 2, section 19, are present
with even stronger force when considering initiative meas-
ures, as in legislative enactment by the Senate and House.

Logrolling is an even greater danger to the democratic
exercise of power in the initiative process. What is to pre-
vent an individual or a group from including mildly objec-
tionable legislation—that is, legislation which might benefit
a small group and is mildly disfavored by the electorate as
a whole—in an initiative measure which includes other
legislation which has great popular appeal? In the legisla-
ture the committee process assures that such a provision
will be detected; the amendment process provides the rem-
edy. The legislature can delete parts of a proposal it disfa-
vors; the electorate is faced with a Hobson's choice: reject
what it likes or adopt what it dislikes. Only article 2, sec-
tion 19, preserves the integrity of the initiative process.

As the California Supreme Court pointed out,

> [e]very reason going to protect the public from imposi-
> tion by undesignated matter in the title of an act of the
> legislature obtains with like if not greater force to a meas-
> ure that is to be voted upon by the people. It is common
> knowledge that an initiative measure is originated by
> some organization or a small group of people and they
> circulate a petition requiring the signature of only eight
> per cent of the voters; that the measure is then placed
> upon the ballot and a large number of the population, not
> knowing what the context of the act is, rely solely upon
> its title as a guide to intelligent voting thereon.

*Wallace v. Zinman, supra* at 592. *Accord, State ex rel. v.
Richardson, supra* (voters have a superficial knowledge of
ballot issues).

The conclusion that article 2, section 19, applies to legislation by initiative is supported by numerous cases decided in Washington in which the Supreme Court has applied this section to legislation by initiative.

In *State ex rel. Seymour v. Superior Court, supra,* the state brought an action to restrain the Secretary of State from filing and canvassing petitions concerning initiative measure No. 62, "generally referred to as the 'game control bill.' " The relator's argument was that the ballot title prepared by the Attorney General did not express and give a true and impartial statement of the purpose of the measure because it failed to state that the measure would have the effect of abolishing the state highway department and restoring the department of taxation and examination. The court held that the ballot title prepared by the Attorney General was correct. The court, in reaching this conclusion, said:

Section [19] of Article II of the constitution of this state provides that no bill shall embrace more than one subject, and "that shall be expressed in the title." If initiative measure No. 62 should be construed as evidencing an intent to repeal chapter 115 of the Laws of 1929, p. 246, and thus abolish the highway department, and chapter 18, section 11 of the Laws of 1925, p. 33, and section 11, chapter 280, of the laws of 1927, p. 683, and thus restore the department of taxation and examination, there is no indication in the legislative title to evidence such an intent, *and to that extent it would not comply with the constitutional requirement* . . .

The language (the organization and administration of the state government), when considered in connection with what follows in the title enumerating the specific departments, is insufficient to cover the repeal of the intermediate acts of 1929, 1925 and 1927, above mentioned. The cases of *Anderson v. Whatcom County,* 15 Wash. 47, 45 Pac. 665, 33 L. R. A. 137 [(1896)]; *Percival v. Cowyche & Wide Hollow Irrigation District,* 15 Wash. 480, 46 Pac. 1035 [(1896)]; and *State v. Clark,* 43 Wash. 664, 86 Pac. 1067 [(1906)], support the holding that the title of the measure would not be sufficient if its intent was to abolish the state highway department and restore the department of taxation and examination. There is no

mention in the legislative title or in the body of the act of either of those departments.

(Italics mine.) *State ex rel. Seymour v. Superior Court,* *supra* at 364-65.

In 1949, two cases were decided by the Washington Supreme Court wherein the constitutional limitation of article 2, section 19, was applied to legislation by initiative. *Randles v. State Liquor Control Bd.,* 33 Wn.2d 688, 206 P.2d 1209, 9 A.L.R.2d 846 (1949), was an action to enjoin the enforcement of Initiative 171, which, along with amendatory and supplemental legislation, was known as the Washington state liquor act. The court determined that the ballot title and legislative title of the initiative were not defective. Although article 2, section 19, was not specifically mentioned, it was the basic issue as the court in *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 21, 211 P.2d 651 (1949), recognized:

> One of the questions presented in *Randles v. Washington State Liquor Control Board,* 33 Wn. (2d) 688, 670, 206 P. (2d) 1209 [(1949)], was whether the title to initiative No. 171 was sufficient to meet the requirements of Art. II, § 19. A claim was made that the title of the act was defective, in that it made no reference to taxes or discounts in favor of certain holders of licenses. We held the title was proper, in that it related to the control and regulation of the preferred license holders.

It should be observed that the applicability of article 2, section 19, to initiative measures was clearly at issue and briefed by counsel.

The requirement that all legislative proposals include no more than one subject is consistent with basic democratic principles. The requirement is designed to present clear legislative proposals to the legislature or the public and forestall the combining of issues so that ones with minimal public support are not adopted merely because they are attached to popular proposals. As the California court stated in *Wallace v. Zinman,* 200 Cal. 585, 254 P. 946 (1927), the evils of multifarious legislation exist at the

voting booths as well as on the floor of the legislature. Two proposals, which do not have enough appeal on their own, may be combined by initiative petitioners in the same way such proposals may be combined by state legislators.

The Washington State Supreme Court has stated this clearly in *Jones v. Centralia*, 157 Wash. 194, 206, 289 P. 3 (1930):

> The rule of law which prohibits the submission of several distinct and unrelated propositions, united as one in such a manner as to require the voter to accept or reject all, is salutary and reasonable, and should be enforced. Its purpose is to prevent the joining of several measures in such a manner that each, by rallying to its support those of the voters who desire its adoption, may gather votes for the group of propositions, and cause the popular measures to carry those which are unpopular and which would fail if presented to the voters separately.

The evils of logrolling in regard to ballot issues has been recognized by the Washington Supreme Court in a series of municipal bond cases.

In *Blaine v. Seattle*, 62 Wash. 445, 447, 114 P. 164 (1911), the court voided a municipal bond issue, which had been passed by voters, on the basis that there were eight different projects included in the proposition. The court stated that the method of submitting these projects in one proposition to the voter

> and compelling him to assent to or dissent from each and all of them or lose his vote is inconsistent with the constitution and laws of the state . . .

When the Washington State Constitution was first adopted in 1889, it contained article 23, which provided that

> if more than one amendment be submitted, they shall be submitted in such a manner that the people may vote for or against such amendments separately.

This provision was in effect when amendment 7 was adopted in November 1912. The people of this state again gave recognition to this principle as recently as November 6, 1962, when amendment 37 was adopted. This amendment

changed article 23, section 1, somewhat, but as to more than one amendment, it remained unchanged.

This is a second and important public recognition that logrolling is of highly dangerous quality to the ability of the people to govern themselves. This principle is so important it is beyond peradventure to say it does not apply to initiatives.

The purpose of such provision has been stated to

prevent an imposition upon or deceit of the public, and to afford voters freedom of choice and prevent "logrolling" —that is, to prevent voters from being required to vote for something of which they disapprove in order to register approval of other propositions tied up therewith.

(Footnotes omitted.) 16 Am Jur. 2d *Constitutional Law* § 37 (1964).

According to the Kansas Supreme Court in *Moore v. Shanahan*, 207 Kan. 645, 655-56, 486 P.2d 506 (1971),

[t]he foregoing quoted provision of Section 1 is mandatory [provision requiring separate submission to people of separate amendments], and requires a submission of proposed amendments in such manner that the electors may vote upon each amendment separately. The provision is a wise one, and is intended to prevent several separate and unrelated subjects from being submitted to the electors in the same amendment, thus forcing them to approve or reject the amendment as a whole. Likewise, it is intended to prevent burdening a meritorious proposition with a vicious one, and also to prevent a vicious proposition from having the support of the meritorious one, thus giving to the elector the right to have each separate proposition submitted to him in order that he may express his will for or against each separately, without being compelled to accept a proposition to which he is opposed, in order to have adopted a proposition which meets his favor.

*See also McBee v. Brady*, 15 Idaho 761, 100 P. 97 (1909). Annot., 94 A.L.R. 1510 (1935).

There are numerous cases in which the court has struck down laws as violative of the single subject provision of article 2, section 19. It would be possible to list and de-

scribe these cases, but in analyzing them it appears that they have been decided on a case-by-case basis, based on the facts surrounding the particular situation.

The court in these cases considered the content of the statute and looked as much at the purposes of article 2, section 19, as at the language. The court in *Blaine v. Seattle, supra,* ruled that bonds for a bridge in the north is one subject and cannot be combined on the ballot with bonds for a bridge in the south; *accord, State ex rel. Washington Toll Bridge Authority v. Yelle,* 61 Wn.2d 28, 377 P.2d 466 (1962) (holding unconstitutional an act dealing with both toll bridges and ferries); *Power, Inc. v. Huntley,* 39 Wn.2d 191, 235 P.2d 173 (1951) (appropriations measures joined to corporate income tax). In *Price v. Evergreen Cemetery Co.,* 57 Wn.2d 352, 357 P.2d 702 (1960), regulation of cemetery endowment funds joined by amendment with a provision making it unlawful for a cemetery to refuse burial to a non-Caucasian was held to be two separate subjects.

On the other hand, it was found a single subject in many cases, *State v. Waggoner,* 80 Wn.2d 7, 490 P.2d 1308 (1971) (revisions to the criminal code); *Water Dist. 105 v. State,* 79 Wn.2d 337, 485 P.2d 66 (1971) (legal powers of water districts); *Branche v. Aumiller,* 147 Wash. 463, 266 P. 723 (1928) (probate code). In many of these cases it is obvious that the challenge under article 2, section 19, was an act of desperation in cases otherwise having meritorious claims that the double subject claim was far fetched.

The court's decisions appear to turn on whether the court concludes that logrolling might have taken place. In *Blaine v. Seattle, supra,* it may have. In *State v. Waggoner, supra,* the court stated that, although the "possibility" existed that legislators would have to vote for provisions of which they disapproved in order to obtain the passage of the act, this was not, in fact, what occurred. *Price v. Evergreen Cemetery Co., supra,* can only be understood as a logrolling case.

Initiative 276 contains a "multitude of subjects," including: (1) disclosure of campaign financing; (2) limitations

on campaign spending; (3) regulation of lobbying activities; (4) regulation of grass-roots educational activities; (5) disclosure of financial affairs of elected officials; and (6) public inspection of public records.

The Official Voters' Pamphlet refers to Initiative 276 as being "divided into four basic parts;" and the Attorney General in his December 22, 1972 opinion, states: "Initiative No. 276 . . . is a comprehensive enactment consisting of *four major substantive chapters*." (Italics mine.)

Furthermore, it is clear that most voters did not appreciate the breadth of Initiative 276. Some voted for it because they favored regulation of campaign financing, although they would not have voted for financial affairs disclosure on its own; others favored the regulation of lobbying activities but were unaware of the other subjects in the initiative. Most voted on "catch phrases." If given an opportunity to pick and choose, voters tend to do so, as they did in the Washington Futures series of related bond issues.

Initiative 276 passed handily. However, without the four separate and distinct subjects being merged together, certain chapters, if not all, could not have won passage standing alone. This is a clear case of logrolling, the results of which article 2, section 19, was promulgated to combat. Support of this contention may be derived from the much narrower voter approval of referenda 24 and 25, each of which had to stand on its own merits without support from logrolling.

The Washington State Supreme Court, in determining whether measures are multifarious, has generally described its focus as the "rational unity" test. The court has determined that the single subject requirement is satisfied as long as there is some "rational unity" between the general subject and the incidental subdivisions. *Water Dist. 105 v. State, supra; Kueckelhan v. Federal Old Line Ins. Co. (Mut.)*, 69 Wn.2d 392, 418 P.2d 443 (1966).

Initiative 276 fails the "rational unity" test. The court has only applied it in situations where the measure has had one major thrust and also contained a few incidental sub-

jects. Initiative 276 has no incidental subjects; all four chapters are major, separate and distinct. Public access to records of regulatory agencies (chapter 4) has no relationship to limitations on campaign spending (chapter 1), etc. Certainly the voters perceive these as unrelated matters.

Another test used in some jurisdictions is the past legislative practice for treating the subjects contained in the statute. If the settled legislative practice is to treat the subjects separately, the fact that they have been combined this first time suggests an effort at logrolling. M. Ruud, *No law shall embrace more than one subject*, 42 Minn. L. Rev. 389 (1958).

The subjects contained in Initiative 276 have in the past been treated separately. Campaign spending regulations are in RCW 29.83; legislative lobbying is now regulated in RCW 44.64; and reports of private financial affairs are now required by RCW 42.21. In fact, the legislature's contemporaneous judgment in submitting referenda 24 and 25 as separate items reflects their consistent view that they are two subjects.

It is clear that there are several separate subjects contained in Initiative 276; they are distinct. If the initiative is allowed to stand, the combining of separate and distinct subjects and logrolling will be condoned in the initiative process. No general "subject" more defined than an amorphous phrase, like "openness in government," can cover this bill; to permit such an "umbrella" would be to vitiate article 2, section 19.

The general purpose behind a legislative title is to call attention to the subject matter of the act so that anyone reading it may know what matter is being legislated upon. *See, e.g., Randles v. State Liquor Control Bd.*, 33 Wn.2d 688, 206 P.2d 1209 (1949).

An initiative ballot title, of course, may suffice for the legislative title required by article 2, section 19 (*Senior Citizens League v. Department of Social Security*, 38 Wn.2d 142, 228 P.2d 478 (1951)), but only if it meets the constitu-

tional requirements. Most initiatives have had both, though drafters may rely upon the Attorney General to draft a broad enough ballot title if they choose. In this case, the ballot title is insufficient as a constitutional title.

The ballot title of Initiative 276 is defective in at least two ways. The general test of sufficiency is whether the title gives "sufficient notice of the object of the act." *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965). The title of Initiative 276 fails to give notice that numerous existing laws, and two bills also before the voters, would be repealed. While it is not necessary that an index of the act appears in the title or that the title must specify the acts being repealed, notice that repealers are included is required. *See State v. Winters,* 67 Wn.2d 465, 407 P.2d 988 (1965) and *Maxwell v. Lancaster,* 81 Wash. 602, 143 P. 157 (1914), each upholding titles which gave notices of repealers by the language "repealing certain acts." Such language is common and accepted as required by the consistent practices of the legislature.

Further, no notice in the title was given of provisions regulating citizens' organizations engaged in grass-roots information activities addressed to the public, rather than to the legislature. Thus an entire major category of the bill, the precise question presented in Young Americans for Freedom, Inc. v. Gorton, Supreme Court cause No. 42878, was not disclosed in the title. The only language coming close is the part of the ballot title referring to "lobbyists." For purposes of Initiative 276 certain public information activities are defined in the act as "grass roots lobbying." But the activities included in section 20 are certainly not what would commonly be understood by the general public as "lobbying." *See United States v. Harriss,* 347 U.S. 612, 98 L. Ed. 989, 74 S. Ct. 808 (1953). The public might well understand that activities by groups such as the Young Americans for Freedom or the League of Women Voters in contacting and attempting to influence legislators would be covered as "lobbying." But nothing in the title gave notice

of a scope broad enough to include "programs addressed to the public."

I would hold the act unconstitutional.

HUNTER, J., concurs with ROSELLINI, J.